William L. FOSTER, Marty Miksch, Far West Enterprises, Ltd., a Limited Partnership, d/b/a Perl Island Lodge, Appellants,

v.

Walter G. HANNI, Stephen W. Anderson, Ervin K. Terry, individually and as members of the Perl Island Ranch Committee, Perl Island Ranch Committee, Perl Island Ranch, a General Partnership, and Harley D. Hess, Appellees.

No. S–4347.

Supreme Court of Alaska.

Nov. 6, 1992.

Rehearing Denied Dec. 8, 1992.

James L. Hopper, Anchorage, Arthur R. Langvardt, Hastings, Neb., and James S. Mitchell, Omaha, Neb., for appellants William L. Foster, Marty Miksch and Far West Enterprises, Ltd.

Michael W. Sewright, Burr, Pease & Kurtz, Anchorage, for appellees Walter G. Hanni, Stephen W. Anderson, Ervin K. Terry, Perl Island Ranch Committee and Perl Island Ranch.

Before RABINOWITZ, C.J., and BURKE, MATTHEWS, COMPTON and MOORE, JJ.

## OPINION

MOORE, Justice.

This case involves a challenge by Walter Hanni, Stephen Anderson, Ervin Terry, the Perl Island Ranch and the Perl Island Ranch Committee (collectively referred to as "Hanni") to the sale of a leasehold prop-

erty interest by Harley Hess to William Foster and others. Hanni originally sold the property at issue, a remote lot on which a lodge is built, to Hess. As part of this sale, Hanni was given a right of first refusal to purchase the property interest should Hess ever offer to sell it.

The superior court granted Hanni's motion for summary judgment, holding that the transfer from Hess to Foster was void because Hanni was not accorded the right of first refusal. Because we conclude that several genuine issues of material fact exist, and that the superior court misapplied the law in several instances, we reverse the superior court's entry of summary judgment and remand this case for further proceedings.

## I. FACTS AND PROCEEDINGS

In 1977 and 1978, Hess sold a portion of his Perl Island real property to Hanni, Anderson and Terry, who formed Perl Island Ranch, a general partnership. Hanni, Anderson and Terry created a development plan for the real property they had purchased. In September 1978, Hess, Hanni, Anderson and Terry executed a declaration which created the Perl Island Ranch Committee ("Ranch Committee"), consisting of all four declarants. The declaration also established 35 undivided interests in the Ranch Development. The owner of each interest was entitled to an "Area Use Lease," which entitled the holder to approximately one acre which could be used for the construction of a single-family dwelling, for up to 100 years.

As a result of an exchange of deeds with Perl Island Ranch, Hess acquired two 1/35th interests in the Ranch Development. Only one of these interests, that which entitled Hess to the lease for Use Area No. 1, is at issue in this case. When the Ranch Committee delivered to Hess the lease for Use Area No. 1, it also delivered a "Lodge Lease" which granted Hess the right to use the Ranch Development, except for other use area parcels, for lodge operations. Paragraph 5 of the Lodge Lease provided that "[t]his lease is deemed personal to Lessee and shall not be hypothecated, sold, assigned, or in any way encumbered by Lessee without the express consent of Lessor in writing." Paragraph 6 stated that "Lessor shall have the first right to meet any bona fide offer to purchase Lessee's undivided interest related to the lodge operation." The Lodge Lease ran from year to year, with Hess to retain all income realized.

Hess built a lodge on Perl Island in 1985. In May 1988, Hess listed his interest in Use Area No. 1 for sale with Active Realty. Foster, who is general partner of Far West Enterprises, Ltd. ("Far West"), a Nebraska limited partnership, made a written offer to purchase Hess's property for $115,000, conditioned upon bank financing and other terms set forth in that offer. Hess accepted this offer on September 11, 1988. On September 15, Hess notified Hanni, Anderson and Terry of his listing agreement with Active Realty. This agreement stated that Hess would provide owner financing. On September 19, Terry sent to the realtor copies of the Declaration, Area Use Lease No. 1, Lodge Lease and other documents pertaining to the Ranch Development, and requested that the realtor provide a copy of the earnest money agreement between Hess and Foster. On September 20, the realtor gave Terry a copy of the earnest money agreement. Hanni, Anderson and Terry elected not to meet the terms of the offers which were described in the listing agreement and the earnest money agreement.

In late November, Anderson and Terry telephoned Foster to indicate their approval of the transfer of the Lodge Lease to him, their eagerness to have him as the new lodge owner, and their desire to have him implement certain wildlife programs. According to Foster, they urged him to further develop the lodge property. On December 27, Hanni wrote the other Perl Island lot owners, stating that "we feel that it may be an asset to the island to have a lodge operating. We, therefore, are in favor of approving the issuance of the Lodge Lease to Bill Foster at no cost." Hanni then wrote to Hess's attorney, asking him to draft a new Lodge Lease in favor of Foster. The Ranch Committee retained at-

torney Michael Sewright, also a lot owner, to handle revision of the Lodge Lease in accordance with their prior discussions with Foster.

Because Foster was unable to arrange bank financing, Hess offered to finance Foster's purchase, as he had offered in the listing agreement. Foster accepted this offer and agreed to pay $30,000 as a down payment. The original purchase price was allocated as follows: (a) $60,000 for Hess's undivided 1/35th interest in the Ranch Development, together with all buildings and improvements located in Use Area No. 1, with Foster's $30,000 down payment to be credited toward this portion of the purchase price, and (b) $55,000 for the assignment by Hess of Area Use Lease No. 1 and the Lodge Lease, this sum evidenced by a separate agreement requiring 10 annual installments of $7,495 each.

On March 21, 1989, Hess and Foster executed an Agreement of Sale of Real Property to Foster for Hess's interest in Use Area No. 1. A subsequent agreement, dated April 2, 1989, obligated Hess to "secure all necessary consents to the assignment of said leases to Buyer, and to the Buyer's future exercise of Seller's rights under said leases." [1] On April 2, Foster paid Hess $10,000 of the down payment to enable Hess to remove an encumbrance and forestall a pending judicial sale of the property. After receipt of this money, Hess gave possession of the property to Foster who assumed possession on or about April 16. Foster paid the $20,000 balance on the down payment on April 28, and Hess delivered to Foster his warranty deed conveying his undivided 1/35th interest in the Ranch Development.

On April 15, Foster met with Terry in Anchorage. They discussed Foster's plans for the lodge operation, details involving ownership of Perl Island Ranch property, and the financial commitments which Foster had made and was intending to make concerning further lodge development. Terry reiterated that the Ranch Committee wanted a new Lodge Lease rather than merely an assignment by Hess of the old lease. Foster agreed to this.

Terry later learned from an agent of a title insurance company that the terms of Foster's impending purchase might be different from the terms which were stated on the earnest money agreement. On April 19, Sewright wrote to Foster's attorney, Arthur Langvardt, expressing his clients' belief "that Mr. Foster's present offer is different than the one my clients were informed of last fall, when I understood Mr. Foster talked with them." Following receipt of this letter, Langvardt and Sewright had several telephone conversations concerning Perl Island Lodge. On May 3, they apparently spoke twice concerning the provisions of the new Lodge Lease. During these discussions, the parties agreed that Hanni, Anderson and Terry would enter into a new Lodge Lease with Foster upon Foster's fulfillment of certain conditions such as increasing his aviation liability insurance to $5 million, executing an indemnity agreement in favor of the Ranch Committee, providing the Ranch Committee with copies of the conveyance and purchase documents, and stocking one of the ponds on the island with fish to prevent depletion by guests of the lodge. Sewright did not indicate that his clients had an interest in acquiring the property.

Shortly after Foster took possession of the lodge, the oil slick caused by the wreck of the *Exxon Valdez* spread to the island. On April 20, Exxon expressed to Foster its interest in using the lodge property during its clean-up operations. Exxon subsequently agreed to pay Foster $4,500 per day for

---

1. Foster's attorney, Arthur Langvardt, wrote a letter to Hanni's attorney, Michael Sewright, on March 3, 1989, which stated:

 I believe Mr. Foster spoke to the members of the committee on October 7, 1988. He still has received no word that assignment of the lease is approved (or disapproved, for that matter).

 The sale is contingent on Mr. Foster's obtaining the lease, and is scheduled for closing. It is essential, because of the timing of the lodge season, that he know right away if there is a problem with the lease.

use of the lodge to accommodate Exxon personnel and to establish a communications site.

On May 8, Foster and the Ranch Committee entered into an "Agreement Re: Interim Use of Perl Island Property by William L. Foster." In this agreement, the Ranch Committee recognized and approved Exxon's use of the lodge facility and the common air strip. Foster was required to deliver to Sewright "all documentation of agreements, including deeds, contracts, and memoranda of understanding, between himself and Mr. Hess and Exxon or any of Exxon's contractors relating to the use of or an interest in the Perl Island property...." Foster was also required to maintain and repair the island's airstrip in safe and suitable condition, provide additional insurance at a cost of $5,000, and prevent waste or damage to any of the Perl Island Ranch property. Foster did all of these things. The parties disagree over whether Foster delivered the documents before or after he was given the agreement for interim use of the property.

According to Foster, Hanni told him on May 15 that "we've decided to go 180 degrees on you ... and that [Hanni] was envious of [Foster's] contract with Exxon." Foster claims that Hanni further stated that Foster was a "Johnny come lately" who was going to make a "windfall profit" by "falling into a pile of $1,000 bills." Hanni advised him that Hanni, Anderson and Terry wanted a "split of the proceeds" for themselves or else they were going to cause legal troubles by whatever means they could. Hanni handed him a document which purported to terminate the permit for Exxon's use of the property. Hanni also produced, and unsuccessfully attempted to have Foster sign, an "amended" interim permit which was exactly the same as the existing permit except that it gave one-half of the gross receipts from Exxon to Hanni, individually.

After threatening to terminate Foster's interim use permit if he would not sign the new permit giving Hanni, Anderson and Terry one-half of the Exxon money, Se-

wright wrote the legal department of Exxon on May 19 and May 23, instructing Exxon to pay Hanni, Anderson and Terry the compensation earned under the agreement between Foster and Exxon. In response, Foster filed a complaint in superior court which sought to enjoin Hanni, Anderson and Terry, individually and as members of the Perl Island Ranch Committee, from further interference with his Exxon contract, compel them to consent to the assignment of Hess's Lodge Lease, and enjoin them from further interference with Foster's peaceable enjoyment of the property. Foster also sought a declaratory judgment as to the legal relationships between the parties. Hanni simultaneously filed a complaint for injunctive relief and damages against Foster, Marty Miksch,[2] Far West and Exxon, alleging that they were trespassers and possessed the island property "contrary to plaintiffs' ownership interests in the property and reserved rights of consent, first right of refusal, and reserved rights to commercially develop the property for lodging." The actions were consolidated by order of the trial court.

Following a hearing, the superior court denied cross-motions for temporary restraining orders. Hanni then filed an answer and a counterclaim which incorporated the allegations in his original complaint. Hanni also filed a motion requesting summary judgment on several different issues. Foster, Miksch and Far West (hereinafter "Foster") filed their answer and a counterclaim for tortious interference. They also filed a motion for partial summary judgment, requesting the court to find that Hanni had no claim to the "specific monies owed by Exxon Corporation" to Foster.

Judge Victor Carlson heard oral argument on the motion for summary judgment, and announced from the bench that Hanni's motion for summary judgment was granted, and that Foster's motion for partial summary judgment was denied. Judge Carlson did not provide an explanation for these decisions. Judge Carlson then signed an order of summary judgment which ordered Exxon to immediately depos-

**2.** Marty Miksch, of Anchorage, is one of the limited partners of Far West.

it with the court the full amount it owed for its use of the Perl Island Property, including prejudgment interest. He ordered that all of that sum in excess of $130,000, and accrued prejudgment interest on $130,000, was to be paid to the Perl Island Ranch Committee and charged against the court account for this matter. The sum remaining in the court registry was to be placed in an interest-bearing account and was subject to further application by the parties. Exxon Corporation deposited a sum of $238,584.16 with the court. Soon thereafter, $85,000 of that sum was disbursed to Hanni in accordance with the court's instructions.[3]

Hess first appeared in this case with his "Stipulation for Entry of Judgment" dated May 30, 1990. This document, signed by Hess and Sewright, purports to allow judgment to be entered against Hess to the same extent as would be entered against Foster, Miksch, Perl Island Lodge and Far West Enterprises. Upon Hanni's "Motion for Entry of Judgment" and this stipulation, the trial court entered a judgment against Foster, Miksch, Far West and Hess.[4] The court held that the transfer of the property by Hess to Foster was in violation of the right of first refusal contained in the Lodge Lease, and that the transfer was therefore null and void. The court also found that the transfer resulted in an irrevocable option at law in Hanni to elect to purchase the property, that Hanni had elected to exercise that option, and that Hanni was therefore entitled to specific performance of the right of first refusal. Hanni was given the right to receive legal assignment of the Lodge Lease by consenting to that assignment. Hess was ordered to execute all documents required to accomplish the specific performance to which Hanni was found entitled. The appellants were also "permanently enjoined and forever prevented from entering, using, or possessing any part" of the property at issue in this case.

By application dated August 29, 1990, Hanni asked that the balance of the Exxon money be awarded to him. The court granted Hanni's application in a supplemental judgment dated October 26, 1990. On that same date, the court denied Miksch's motion for summary judgment that, as a limited partner, he was not individually liable. By order of September 5, 1990, the court summarily awarded various items of "expense" to Hanni, as well as $20,000 in "punitive sanctions." The court also signed another order imposing sanctions upon Foster pursuant to Alaska Rule of Civil Procedure 37(a)(4).

The trial court directed the entry of final judgment. The trial court also entered an order confirming its entry of judgment against Miksch. The court awarded $2,500 in costs and attorney's fees to Hanni, and $1,200 in costs and attorney's fees to Hess. This appeal followed.

## II. DISCUSSION

Foster challenges several aspects of the superior court's handling of this case. He argues that the court erred in awarding summary judgment, in denying his motion for partial summary judgment, in entering the judgment, in entering the supplemental judgment, in denying Miksch's motion for summary judgment as to Miksch, and in ordering him to pay certain "expenses and sanctions."

### A. DID THE SUPERIOR COURT ERR IN GRANTING SUMMARY JUDGMENT TO HANNI ON THE BASIS THAT HIS RIGHT OF FIRST REFUSAL IN THE LODGE LEASE WAS VIOLATED?

Hanni's motion for summary judgment alleged that the assignment by Hess to Foster was void because it violated Hanni's

---

**3.** According to Hanni's counsel, the sum of $153,584.16 plus interest remains subject to disbursement.

**4.** Hess's status as a party to this case is somewhat uncertain. The appellees filed a motion to amend their complaint to add Hess as a defendant. Subsequent to the filing of that motion, on December 1, 1989, appellants' counsel was

seemingly assured by Judge Carlson that the complaint would not be amended for purposes of the summary judgment hearing on that date. The parties later discovered that Judge Carlson, on November 30, 1989, had written on the bottom of the motion to file an amended complaint that it was allowed. This "order" was not circulated until December 28, 1989.

right of first refusal. Hanni asserted that the assignment therefore gave him an irrevocable option at law to purchase Hess's rights upon the same terms as the purported purchase of Foster. Hanni declared his intention to exercise this option. He claimed that he was entitled to "receive all right, title and interest in said property as of the date of Mr. Hess' [sic] sale of the property to Mr. Foster in 1989, including any and all compensation owed for use of the property by the plaintiffs thereafter."

■ Despite Foster's defenses,[5] Judge Carlson summarily granted Hanni's request for summary judgment, stating that "there are no genuine issues of material fact with regard to [Hanni's] motion" for summary judgment. Foster challenges that decision, claiming that there existed several genuine issues of material fact, and that the appellees were not entitled to judgment as a matter of law. In reviewing an order of summary judgment, this court must reverse the order if the pleadings and evidence presented reveal either the existence of any genuine issues of material fact or that the moving party is not entitled to judgment as a matter of law. *Jennings v. State,* 566 P.2d 1304, 1308 (Alaska 1977); *Moore v. State,* 553 P.2d 8, 15 (Alaska 1976).[6]

### 1. *Did there exist genuine issues of material fact?*

a. Is Hanni estopped from asserting the right of first refusal?

■ Foster asserts that Hanni is estopped from asserting the right of first refusal. Before examining whether Hanni

is estopped, it is necessary to consider whether Hess's offer to finance Foster's purchase actually constituted a second offer to which Hanni had a new right of first refusal. The parties cited no cases which dealt with the precise question of whether an all cash offer is so different from a later offer at the same price, but with owner financing, that the latter offer would have to be resubmitted to the holder of the right of first refusal. Several courts have examined whether the offer of the holder of the right of first refusal was on the same terms as that of the third party offeror. *See, e.g., Northwest Television Club, Inc. v. Gross Seattle, Inc.,* 96 Wash.2d 973, 634 P.2d 837, 841 (1981). In such cases, courts will generally find that the offers were not on the same terms only if their terms are materially different. *See id.*

Foster argues that there was but one offer, claiming that the financing provision was not a condition precedent to the existence of a valid contract, "but only a condition precedent to the duty of both parties to render their promised performances." Foster also notes that Hess originally sent Hanni his listing agreement, the terms of which stated Hess's willingness to provide owner financing, and that Hanni refused to accept these terms. Hanni responds that "different financing arrangements, interest rates, and periods of payment make for a very different *real* 'total' purchase price." He claims that as a matter of law and undisputed fact, the finance terms differed greatly between Foster's September 1988 offer and his April 1989 offer.

After reviewing the terms of the alleged second offer, we conclude that there were

**5.** Foster asserted many defenses to Hanni's motion for summary judgment. His primary defenses were that Hanni had waived any right he had to refuse consent to Hess's assignment of his lodge lease and to insist upon a right of first refusal, and that Hanni was estopped by Foster's reliance from asserting his right of first refusal.

**6.** Hanni argues that Miksch, Perl Island Lodge and Far West Enterprises waived opposition to Hanni's motion for summary judgment because they presented no opposition to that motion. In the case upon which Hanni relies most heavily in making this argument, *Jerrel v. Kenai Peninsula Borough Sch. Dist.,* 567 P.2d 760 (Alaska 1977), no briefs were filed in opposition to summary judgment, thus disrupting the court's calendar and the "prompt handling of litigation." *Id.* at 764–65. In the case at bar, briefs in opposition to the motion were timely filed by Foster. Even more importantly, Foster's interests are almost exactly the same as the interests of the parties alleged to have waived opposition, since he is the only general partner in Perl Island Lodge and Far West Enterprises. For these reasons, and in light of the fact that the law firm employed by Foster was clearly representing these parties at the time it filed Foster's opposition, that firm's failure to list the other parties on its opposition does not constitute a waiver of their opposition. *See* Alaska R.Civ.P. 94.

two offers. Among other differences in the offers, the second offer provided for long-term seller financing instead of requiring a cash payment. This difference, particularly in view of the fact that banks were unwilling to finance the transaction, made the second offer substantially more attractive to a potential buyer than the first offer. As such, we find that Hess's offer to finance Foster's purchase actually constituted a second offer to which Hanni had a new right of first refusal.

 Having concluded that Hess's offer to finance Foster's purchase constituted a second offer to which Hanni was accorded a right of first refusal, we proceed to examine whether Hanni acted in such a way as to warrant estoppel of that right. Courts in many other jurisdictions have recognized that a litigant can be estopped from claiming a right of first refusal. *See, e.g., Katskee v. Nevada Bob's Golf of Neb., Inc.,* 238 Neb. 654, 472 N.W.2d 372, 376 (1991); *Urban Hotel Management Corp. v. Main and Washington Joint Venture,* 494 N.E.2d 334, 338 (Ind.App.1986). We agree with these courts.[7]

 In Alaska, the general requirements for application of the doctrine of equitable estoppel are the assertion of a position by conduct or word, reasonable reliance thereon by another party, and resulting prejudice. *Arctic Contractors, Inc. v. State,* 564 P.2d 30, 40 (Alaska 1977). The record indicates that Hanni may have failed to assert his right of first refusal despite his knowledge of the terms of the second offer, and Foster may have detrimentally relied upon Hanni's apparent consent to the sale. The letter sent by Sewright to Langvardt on April 19, 1989, clearly reveals that Sewright knew that there had been a modification of the offer which his clients had earlier declined to meet. Moreover, if Foster's account is correct, Hanni was aware of the specific terms of the Foster–Hess deal before he gave Foster written permission to lodge the Exxon workers on the property.[8] As to the question of Foster's reliance, it appears as if Foster expended great sums in making Exxon's requested improvements and providing services to Exxon, in apparent reliance upon Hanni's approval of the sale to Foster.[9] Because of the existence of these genuine issues of material fact, the superior court erred in awarding summary judgment. On remand, the court must resolve these issues to determine whether Hanni is estopped from asserting his right of first refusal.[10]

**b. Did Hanni tender performance?**

 Foster next argues that the trial court failed to consider whether Hanni had

---

**7.** Hanni argues that an estoppel analysis is inappropriate because "no duty to exercise [a right of first refusal] arises until the offer is squarely presented to the holder of the right by the party obligated, in its complete, clear and unequivocal terms...." In support of this argument, Hanni cites several cases from other jurisdictions which state that the holder of a right of first refusal is entitled to notice of the terms of a proposed sale and an opportunity to purchase under those terms. *See, Prince v. Elm Inv. Co., Inc.,* 649 P.2d 820, 826 (Utah 1982).

We recognize that the holder of a right of first refusal is generally entitled to notice of the terms of a proposed sale and an opportunity to purchase under those terms. Nonetheless, in those cases where the holder of a right of first refusal has knowledge of the terms of an offer and apparently waives his right, and where the seller reasonably relies on this waiver, it is not inappropriate to estop the holder from asserting the right of first refusal.

**8.** Hanni claims that the agreement "does not recognize (and in fact disclaims) any right in Foster material to the right of first refusal, im-

plicitly or otherwise, and does not waive compensation for Exxon's use of the type that later became known." He argues that the agreement was executed only after Foster "thrust himself upon the island," misrepresented the use and compensation being paid, and commenced unauthorized air operations on the island. Again, this disagreement with Foster shows the existence of a genuine issue of material fact.

**9.** Hanni argues that Foster had already begun making improvements to the island prior to Hanni's alleged acquiescence to the terms of the Foster–Hess deal, and that Foster therefore "cannot now be taken seriously when he claims that he 'changed his position in reliance' on the interim use document." This argument raises another genuine issue of material fact.

**10.** Foster also claims that there exist genuine issues of material fact as to whether Hanni waived the right of first refusal. In *Milne v. Anderson,* 576 P.2d 109 (Alaska 1978), we stated that "[a]n implied waiver arises where the course of conduct pursued evidences an inten-

tendered performance of the purchase price to Hess before the court ordered specific performance of the right of first refusal. In *C. Robert Nattress & Assocs. v. Cidco*, 184 Cal.App.3d 55, 229 Cal.Rptr. 33 (1986), which involved a claim for specific performance of a right of first refusal, the court stated:

> [I]t is axiomatic that to obtain specific performance, a buyer must prove not only that he was ready, willing and able to perform at the time the contract was entered into but that he continued ready, willing and able to perform at the time suit was filed and during the prosecution of the specific performance action.

*Id.* 229 Cal.Rptr. at 37. Despite this recognized requirement, Judge Carlson apparently awarded specific performance without considering whether Hanni tendered performance.[11] Because of this mistake, the court on remand should determine whether Hanni was ready, willing and able to perform Foster's contract from the time that Foster and Hess entered into their contract until the termination of the prosecution of the specific performance action.

### c. Does equity require specific performance?

■ Foster's final argument is that the trial court failed to weigh equitable issues concerning the propriety of specific performance in light of the involvement of a third party buyer such as Foster. We agree. The Restatement (Second) of Contracts, § 364 (1981) provides that specific performance should be refused if it would cause unreasonable hardship or loss to the party in breach or to third persons. If the trial court determines that specific performance is otherwise appropriate, it should consider whether specific performance should be refused because it would cause unreasonable hardship or loss to Foster.[12]

### 2. Were appellees entitled to judgment as a matter of law?

■ Perhaps the most serious problem with this case is that Hanni is attempting to enforce a contractual provision in his lease with Hess, the right of first refusal provision, against a person who is not a party to that agreement. As Foster states in his brief, "Hanni is simply seeking the wrong person's money." While Hanni might have a case against Hess for breaching the right of first refusal provision, he does not have a claim against Foster, Miksch, Far West Enterprises or Perl Island Lodge for breaching that provision, since Hanni did not contract with Foster. As such, Hanni was not entitled to summary judgment as a matter of law. On

tion to waive a right, or is inconsistent with any other intention than a waiver, or where neglect to insist upon the right results in prejudice to another party." *Id.* at 112. Applying this test, the record suggests that Hanni may have waived the right of first refusal. When Foster contacted Terry and Anderson by telephone to discuss his plans for the lodge, they voiced no objections to his acquiring and operating the lodge. Terry and Anderson later telephoned Foster to discuss their desire to have him operate the lodge. In December 1988, Hanni sent a letter to all lot owners saying he was in favor of issuing the Lodge Lease to Foster at no cost and would "probably" issue the lease to Foster if no one objected. There is no evidence that Foster was ever informed of any objection to the assignment. Because there exist genuine issues of material fact with regard to the question of whether Hanni waived his right of first refusal, the superior court erred in entering summary judgment against Foster.

**11.** In Hanni's Reply to Opposition to Motion for Summary Judgment, dated September 29, 1989,

Hanni stated that he was ready, willing and able to meet the terms contained within Foster's second offer. A mere assertion in a pleading is insufficient to prove that he was ready, willing and able to perform at the time the contract was executed.

**12.** Foster maintains that the superior court should have conducted an evidentiary hearing to determine whether reimbursement was due him when specific performance was granted. Hanni disagrees, claiming that Foster's argument simply dredges up issues of damages appropriately dealt with in the court's supplemental judgment.

The affidavits and exhibits in the record show that extensive evidence concerning the parties' damages was introduced by both parties. If the trial court determines upon remand that specific performance is called for, it should also determine whether to hold an evidentiary hearing for purposes of fashioning a proper remedy.

remand, the court should consider whether Hanni has a case against Hess for breaching the right of refusal.[13]

■ Foster also argues that summary judgment was inappropriate because Hanni's complaint requested only damages for trespass, while his motion for summary judgment requests specific performance and the money owed to Foster by Exxon. Foster mischaracterizes the complaint when he states that it only alleges trespass. Count I states: "The defendants are and have been in continuing trespass upon plaintiffs' property and in contravention of plaintiffs' rights of consent and first refusal and reserved right to operate a commercial lodge...." Even if Hanni's complaint had not put Foster on notice of the relief sought by Hanni, Hanni's motion for summary judgment certainly gave Foster that notice and an opportunity to respond to those claims. This argument lacks merit.

## B. DID THE SUPERIOR COURT ERR IN DENYING THE APPELLANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT?

■ Foster's motion for partial summary judgment requested the trial court to hold that Hanni had no claim to the "specific monies owed by Exxon Corporation" to Foster. After hearing arguments on this motion, Judge Carlson denied the motion from the bench without giving a reason for his decision.

Hanni asserts that this denial was correct because the adoption of Foster's position "would be an announcement to the world that any trespasser or similar person such as Foster who disregards the rights of the equitable owner of the property is entitled to the mesne profits from the land even though it is not rightfully his land." This argument lacks merit. As discussed below, Hanni was not entitled to the specific money owed by Exxon to Foster, under either the theory of trespass or specific performance of the right of first refusal. Even if Foster owed Hanni damages or restitution, Foster would not owe the payments from Exxon. The trial court therefore erred in denying Foster's motion for partial summary judgment.

## C. THE SUPERIOR COURT'S AWARD OF DAMAGES

### 1. *Did the superior court properly award to Hanni the Exxon monies as lost profits?*

■ Foster argues that even if Hanni had articulated a plausible claim for an award of damages, Hanni was not entitled to all of the Exxon money as "lost profits." Citing § 351 of the Restatement (Second) of Contracts, Foster observes that damages are not recoverable for a loss that the breaching party did not have reason to foresee as a probable result of the breach when the contract was made. He claims that the parties to the Lodge Lease could not foresee in 1978 that an oil spill ten years later would destroy the fishing season and bring clean-up crews to the area, and that the premises would be leased to an oil company at a high rate. We agree. In addition, Foster correctly notes that the expectation interest damages awarded an injured party must be reduced by those costs that he has avoided by not having to perform. Judge Carlson inexplicably failed to take into account the sums expended by Foster prior to Exxon's renting the property.

Hanni maintains that normal restitution damages are inappropriate for the alleged breach of the lease provisions "[i]n that Foster had forced himself upon the Perl Island property in violation of Hanni, et al.'s rights in order to unjustly enrich himself...." Judge Carlson seems to have

---

**13.** As discussed in footnote 4, *supra*, Hess's status as a party in this case is somewhat uncertain. Assuming that Judge Carlson added Hess as a defendant as a result of the appellees' motion to amend their complaint, it is proper for the superior court to consider the motion for summary judgment against Hess only. While Hess has apparently aligned with Hanni since the appellees moved to have Hess added as a defendant, that realignment does not preclude the superior court from considering the motion for summary judgment against Hess.

shared this view, as indicated by his statement that "I don't understand how you can say that the person who plants barley on somebody else's ranch gets to keep the proceeds of the barley crop." The problem with this view is that Foster was not a conscious wrongdoer. Foster occupied the land pursuant to an apparently valid contract, and received a deed and agreement for assignment of the leases from Hess, the undisputed owner of the interests. As recognized in the Restatement of Restitution § 203, when a person innocently converts the property of another, the true owner is entitled only to the value of the property converted, and not to the profits which the converter has made by a disposition of the property.[14] While conversion generally involves chattels, and not real property, the general principle asserted in § 203 is applicable in this case. Because Foster was not a conscious wrongdoer he is liable, if at all, for only the normal rental value of the property converted, not for the abnormally large rent payments which he received as a result of both the unusual circumstances which arose after he took possession and his efforts in persuading Exxon to rent the premises.[15] *See Alyeska Pipeline Serv. Co. v. Anderson,* 629 P.2d 512, 526–28 (Alaska 1981) (recognizing that in trespass-conversion cases, the trespasser will be liable for a larger damage award if the trespass is unsuccessful), *cert. denied,* 454 U.S. 1099, 102 S.Ct. 674, 70 L.Ed.2d 641 (1981); *Rollins v. Leibold,* 512 P.2d 937, 945–46 (Alaska 1973) (where defendant was an "innocent converter" of a crane, plaintiff could recover the value of the crane plus interest, but not the net lost profits).

2. *Did the superior court correctly determine that Miksch was individually liable for the damages awarded?*

 Miksch argues that because he is a limited partner of Far West, the court erred in entering judgment against him. The trial court entered summary judgment against Miksch, together with Foster and Far West, on August 3, 1990. Miksch then filed a motion for summary judgment on the ground that as a limited partner, he was not individually liable. Judge Carlson denied this motion.

14. Section 203 of the Restatement of Restitution (1937) provides in part:

§ 203. INNOCENT CONVERTER

Where a person converts the property of another without notice of the facts which make him a converter and being still without such notice exchanges it for other property, the other is entitled to an equitable lien upon the property received in exchange to secure his claim for restitution, but is not entitled to enforce a constructive trust of the property.

Caveat: It is not intended to express any opinion on the question whether a constructive trust can be enforced against a converter who has disposed of the property converted and acquired in exchange other property without knowledge but with notice of the facts which make him a converter ...

Comment:

a. *Reason for the rule.* Where the converter is a conscious wrongdoer, he can be compelled to surrender any profit which he makes by a disposition of the claimant's property, and not merely to restore to the claimant the value of his property, since if he were permitted to keep the profit there would be an incentive to wrongdoing, and compelling him to surrender the profit operates as a deterrent upon the wrongful disposition of the property of others. . . . This reason is not applicable to persons who are not conscious wrongdoers. A person who innocently converts the property of another is liable to the other for the value of the property converted, and if through the disposition of this property he acquires other property, the other can enforce an equitable lien upon the property so acquired as security for his claim against the converter for the value of the property converted, and if the property so acquired is of less value than the property converted, the other can hold the converter personally liable for the balance of his claim. If the property so acquired is of greater value than the property converted, the other cannot reach the profit by enforcing a constructive trust of the property so acquired. The owner of property converted is entitled to be made whole but not to reach the profit.

15. In his memorandum in support of the motion for summary judgment, Hanni offered additional theories to justify his claim for all the money which Foster received from Exxon. He asserted that "[w]here the property has been placed in the possession of a third party, recovery is afforded under the equitable doctrines of quasi-contract or assumpsit or unjust enrichment." On remand, the superior court should consider the validity of these arguments.

Because Judge Carlson did not provide an explanation for his decision to deny Miksch's motion, we do not know the basis for his decision.[16] The pleadings suggest two possible grounds. First, the trial court might have relied upon Hanni's arguments that the Far West limited partnership did not comply with Alaska law governing the formation of limited partnerships, including recordation of the appropriate certificate in the manner mandated by statute, and that Miksch was therefore individually liable. This argument is problematic. Contrary to Hanni's characterization of the law, AS 32.-10.010 does not clearly require foreign limited partnerships to comply with the Alaska law regarding formation of partnerships. Alaska's version of the Uniform Limited Partnership Act makes no provision for recognizing a foreign limited partnership. The fact that the statutes do not clearly require foreign limited partnerships to comply with state formation laws suggests that Far West could operate in Alaska as a limited partnership.[17]

The other possible ground for the court's decision to enter judgment against Miksch is that the Far West limited partnership did not qualify as a limited partnership during the period of events at issue, since Far West did not file a limited partnership certificate in Nebraska until May 1990. Foster concedes that the Nebraska limited partnership certificate was not filed with the Nebraska Secretary of State for a year after the agreement was signed by all the partners, but claims that this does not prevent those who signed the certificate as limited partners from enjoying limited liability. The validity of this argument seems to depend upon whether Far West was a limited partnership under Nebraska law at the time of the material acts in this case. Section 67–240 of the Revised Statutes of Nebraska requires a filing of the partnership certificate with the Secretary of State, but Neb.Rev.Stat. § 67–244(a) (1990) provides for "filing by judicial act" if "the court finds that it is proper for the certificate to be executed and that any person so designated has failed or refused to execute or file the certificate, it shall order the Secretary of State to execute and record an appropriate certificate." Although the record before us remains unclear on the issue of limited partnership status, it appears that Miksch may not have been a limited partner before the certificate was validly filed in May of 1990. Nonetheless, there may have been damages awarded against Miksch, as a general partner, which arose from actions taken after a valid limited partnership was formed in Nebraska. These same awarded damages against Foster must be reversed for the reasons mentioned above and this same result pertains also to Miksch in his status as either a general partner or a limited partner.

Because both grounds suggested by the pleadings for the court's decision to hold

---

**16.** While Miksch's motion might appear untimely, because he did not file his motion until after summary judgment had been ordered and entered against him, the motion probably was not untimely. Miksch filed his motion prior to the court's supplemental judgment, giving the court an opportunity to dismiss Miksch prior to its disposition of the interpled funds and its order that the appellants pay certain expenses incurred by Hanni. Judge Carlson apparently did not view Miksch's motion as untimely, for he expressly considered the motion and the parties' arguments as to its merits before denying the motion.

**17.** American Jurisprudence provides:

Case authority as to when a foreign limited partnership must register in the state is sparse and corporation law has been looked to for guidance. On that basis the rule that a for-

eign corporation is not doing business in a state when it only engages in casual, occasional or isolated acts and transactions, such as the purchase or leasing of property, has been applied to a foreign limited partnership.

Since the original (1916) Uniform Act does not provide for the recognition of out-of-state limited partnerships, firms often refile their certificates in each state in which they do business, if the original Act is in force there. However, courts have recognized their right to do business without having filed at all.

*Caution:* Such is not likely to be the rule in a state which has adopted one of the provisions specifically requiring a foreign limited partnership to file.

59A Am.Jur.2d *Partnership* § 1248 (2d ed. 1987) (citations omitted).

Miksch individually liable are of questionable merit, we reverse the court's entry of judgment against Miksch. We do not reverse the court's denial of Miksch's motion for summary judgment, for our review revealed the genuine issues of material fact and questions of law which are discussed above.

## III. CONCLUSION

For the reasons discussed above, we REVERSE the superior court's order of summary judgment against Foster, Miksch, Far West Enterprises, Ltd. and Perl Island Lodge based upon a breach of the lease provision granting Hanni the right of first refusal. We REMAND for further proceedings consistent with the matters discussed in this opinion. Whether Hanni's motion of summary judgment should be entered against Hess for allegedly breaching the right of first refusal should also be considered on remand. We also REVERSE the superior court's denial of Foster's motion for partial summary judgment, and order the court to enter judgment on this motion that Hanni, as a matter of law, had no claim to the specific monies owed by Exxon Corporation to Foster for daily use of the lodge facilities. Furthermore, we REVERSE the superior court's ruling that Miksch is not a limited party entitled to summary judgment. All other orders and judgments entered by the superior court, including the supplemental judgment and the order which require Foster to pay certain "expenses and sanctions," are VACATED.