**Boudewijn ROELAND and Hendrika Flamee, Appellants,**

v.

**Douglas TRUCANO, Trucano Construction Co., A & J Building, LLC, and Steve Landvik, Appellees.**

No. S–12850.

Supreme Court of Alaska.

Aug. 21, 2009.

**34.** *See supra* note 1.

Richard W. Maki and David H. Shoup, Tindall Bennett & Shoup, Anchorage, for Appellants.

Anthony M. Sholty, Faulkner Banfield, P.C., and Alexander Hildebrand, Baxter, Bruce & Sullivan, P.C., Juneau, for Appellees.

Before: FABE, Chief Justice, MATTHEWS, EASTAUGH, CARPENETI, and WINFREE, Justices.

*OPINION*

CARPENETI, Justice.

## I. INTRODUCTION

Real estate investors sued for two alleged breaches of the investors' right of first refusal regarding a parcel of real property. The first arose from the proposed transfer of a twenty-five percent interest in the property to a third party in exchange for a twenty-five percent interest in a business to be operated by a third party on the property. The second arose from the later actual transfer of the entire property to an LLC owned by the parties involved in the initial proposed transaction. After trial, the superior court found against the investors on all issues. Because the investors had reasonable notice of the proposed transaction and did nothing to clar-

ify any confusion about its precise terms, and because the later transfer was a matter of structural convenience to effectuate the originally proposed transaction and not a separate sale triggering the right of first refusal, we affirm the superior court's decision in all respects.

## II. FACTS AND PROCEEDINGS

Appellants Boudewijn Roeland and Hendrika Flamee resided in Belgium but owned several investment properties in Juneau. In 2000 Appellee Steve Landvik approached Roeland and Flamee with a proposal to build a retaining wall for their property in the heart of Juneau's downtown tourist retail district on South Franklin Street. Roeland and Flamee had purchased the property in an undeveloped state in the 1990s, intending to develop it into a building with shops and apartments or offices. They agreed to pay Landvik $300,000 for a retaining wall for the property to be completed by April 1, 2001.

Landvik later informed Roeland and Flamee that he would be unable to complete the wall on time or within budget. In August 2001 Landvik and a business associate, Douglas Trucano, met with Roeland and Flamee several times to attempt to determine how to proceed regarding the retaining wall. During the negotiations, Landvik and Trucano offered to purchase Roeland and Flamee's property and provide Roeland and Flamee a right of first refusal in the event Landvik and Trucano decided to sell the property. Roeland and Flamee agreed. The agreement stated that if Trucano and Landvik decided to sell the property, they would notify Roeland and Flamee of their intent to sell. Roeland and Flamee would then have the first right to purchase for ninety days "on terms identical to the terms [Trucano and Landvik] have offered to, or received from, any third party." Title to the property was ultimately transferred to Trucano Construction Company for bank financing purposes, and Trucano and Landvik were each personal guarantors of the right of first refusal.[1]

Trucano and Landvik wished to build a retail building on the property and posted a sign seeking potential renters for the future building. In late 2001 they were contacted by David Coates. Coates owned souvenir shops in Ketchikan and desired to open businesses in Juneau. He offered an interest in any future souvenir shops that he opened in Juneau in exchange for an interest in the property. The parties negotiated and entered into a Memorandum of Understanding (MOU). Trucano and Landvik mailed a notice to Roeland and Flamee informing them of the offer, attaching a copy of the MOU, and giving them first right to purchase "on terms identical to the terms that they have offered to, or received from, a third person or entity."

The MOU memorialized the parties' "intentions and desires" and was a "framework for entering binding agreements in the future." Trucano and Landvik agreed to sell twenty-five percent of the property to Coates, and Coates agreed to sell to Trucano and Landvik a twenty-five percent interest in any stores he would operate in the future building. The MOU further stated that the "same arrangement would apply" in the event Coates opened any other businesses in Juneau, and that Coates intended to acquire two stores and establish a wholesale business. The parties stated that they would apply for a bank loan to finance the building. They also stated their understanding as to when and how much rent Coates would pay to "T & L Building," an entity that is not defined in the agreement. Additionally, Coates agreed that "the conveyance or transfer of any interest in the T & L Building or the property on which the T & L Building is constructed" would be subject to a third party's right of first refusal. The MOU estimated the value of the business at seven million dollars.

Roeland and Flamee responded to the notice of the MOU in an April 2002 letter informing Trucano's attorney that they were "not in the possibility yet to reply positively or negatively regarding the Right of First

---

1. The recorded notice of the right of first refusal, signed by an agent for Roeland and Flamee, expressed an exception to the right of first refusal for any "sale of stock in the company or the property" and any transfers between Landvik, Trucano, their families, and the company.

Refusal." Roeland and Flamee went on to state that the MOU was "just a business proposal" with no exact sale price, and that they did not "have any interest in becoming partners with Landvik, Trucano and/or their renter." They concluded at the end of the letter that "this is NOT a Right of First Refusal" and said they wanted a new offer of sale with exact figures for the twenty-five percent interest in the property. Trucano's attorney responded to this communication by stating that "there was an exact figure in the MOU; it was $7 million," referring to the estimated valuation of the business enterprise contained in the MOU. Trucano's attorney also wrote, "if you want [Trucano] to sell [the interest] to you, then pay the $7 million," and otherwise generally reasserted that the terms of the sale were contained in the MOU.

Roeland and Flamee had no further communication with Trucano's attorney. Flamee testified that she attempted to e-mail Trucano and to call Landvik. The trial court found credible Trucano's statement that he did not get the e-mail because he did not use that e-mail address; the trial court was not able to determine why Landvik did not return Flamee's call. Development of the property proceeded as planned under the MOU except that Landvik could not or did not contribute his financial share and was not thereafter involved with the project.

In July 2004, in the final effectuation of the MOU, Trucano Construction Company deeded the property to A & J Building LLC. That LLC was owned seventy-five percent by Trucano, twelve and one-half percent by David Coates and his wife, and twelve and one-half percent by Gary and Meeta Jethani. Gary Jethani is a business partner with Coates in Ketchikan. Trucano, Coates, and the Jethanis also formed Alaska–Juneau Mining LLC at or around the same time. Trucano owns a twenty-five percent interest in that LLC, which owns the retail business contemplated by the MOU. The Coateses and Jethanis together own the remaining seventy-five percent of the second LLC. During the summer of 2004 the retail business began operations in the building constructed on the property.

Roeland and Flamee sued Trucano Construction Company, Landvik, and Trucano in March 2005 for breach of their right of first refusal with regard to both the 2002 MOU and the 2004 effectuating transactions, later adding A & J Building LLC as a defendant, as well. They also sued for breach of the implied covenant of good faith and fair dealing and for misrepresentation. The case was tried before Superior Court Judge Patricia A. Collins, who found against Roeland and Flamee on all claims, ruling that: (1) the 2002 MOU was sufficient to give Roeland and Flamee fair notice of the terms of Coates's offer; (2) the MOU was negotiated at arm's length and in good faith and was not designed to cut off Roeland and Flamee's right of first refusal; (3) Roeland and Flamee did not have a contractual right to demand a cash offer instead of the MOU; (4) Roeland and Flamee waived their right of first refusal as to an offer to form a business; (5) Roeland and Flamee rejected the cash version of the offer; (6) the MOU was implemented without material deviation; (7) Roeland and Flamee were equitably estopped from claiming breach because they stated that they would not agree to a partnership-type arrangement and waived their rights; and (8) the 2004 conveyance to the LLC was not a sale giving rise to a new right of first refusal for the remaining seventy-five percent of the property, but merely a transfer of convenience implementing the business plan set out in the 2002 MOU.

Roeland and Flamee appeal.

### III. STANDARD OF REVIEW

Under Civil Rule 52(a), factual findings shall not be set aside unless they are clearly erroneous. A finding is clearly erroneous only if the reviewing court is left with a "definite and firm conviction that a mistake has been made."[2] When reviewing factual findings, we view the evidence in the light most favorable to the prevailing party below.[3]

We review questions of law using our independent judgment and will adopt "the

---

**2.** *Municipality of Anchorage v. Gregg,* 101 P.3d 181, 186 (Alaska 2004) (quoting *Am. Computer*

*Inst., Inc. v. State,* 995 P.2d 647, 651 (Alaska 2000)).

**3.** *Fuller v. City of Homer,* 113 P.3d 659, 662

rule of law that is most persuasive in light of precedent, reason and policy."[4]

## IV. DISCUSSION

### A. The Trial Court Did Not Err in Ruling that Trucano and Landvik Did Not Breach Roeland and Flamee's Right of First Refusal with Respect to the 2002 MOU.

■ Roeland and Flamee claim that they were given insufficient notice of the transaction terms set out in the 2002 MOU. The general rule is that when an owner receives an offer to purchase an interest in a property burdened with a right of first refusal, the owner must provide adequate notice of the terms of the offer to the holder of the right.[5] Adequate notice is notice sufficient to enable the holder of the right of first refusal (the right-holder) to decide whether to attempt to match the terms.[6] Once the seller has made reasonable disclosure of the material terms, the right-holder has a duty to further investigate any terms that he or she finds unclear.[7] We consider first whether the MOU was adequate to trigger a duty by Roeland and Flamee to investigate further. Following that, we examine Roeland and Flamee's response to the MOU.

### 1. The trial court's finding that disclosure of terms in the MOU was adequate to trigger a duty to investigate further was not clearly erroneous.

■ Roeland and Flamee argue that the MOU was too vague and incomplete to provide reasonable disclosure of the terms of Coates's offer. Therefore, they argue that their duty to investigate the unclear terms did not arise, or that if it did arise, that their April response letter sought clarification and they did not get it.

■ Questions regarding the adequacy of notice are questions of fact.[8] Most courts that have considered the issue have adopted the rule that adequacy of notice of a proposed sale to a right of first refusal holder is sufficient if it provides actual notice of a potential sale and sufficient information for the right-holder to determine if he or she is interested in exercising the right.[9] The trial court used this standard. We agree with Judge Collins that this was the correct standard.

■ The transmission of the third-party offer to the right-holder acts as the seller's offer to the right-holder.[10] The offer's terms must be sufficiently definite to evaluate, and all essential terms in the third-party offer must be communicated to the right-holder.[11] Generally, this means a written copy of the offer or agreed terms should be provided.[12] In this case, the entire agreement was provided to Roeland and Flamee. The three-page MOU, comprising twenty paragraphs, was sufficiently detailed to trigger Roeland and Flamee's duty to investigate the offer's terms further if they had questions.

Roeland and Flamee provide an extensive list of details missing from the MOU, but the

---

(Alaska 2005).

4. *Guin v. Ha,* 591 P.2d 1281, 1284 n. 6 (Alaska 1979).

5. *See Dyrdal v. Golden Nuggets, Inc.,* 672 N.W.2d 578, 584 (Minn.App.2003).

6. *Id.* at 585.

7. *Id.* (quoting *Koch Indus., Inc. v. Sun Co.,* 918 F.2d 1203, 1212 (5th Cir.1990)).

8. *See Jensen v. Alaska Valuation Serv., Inc.,* 688 P.2d 161, 164 (Alaska 1984) (adequacy of disclosure of agency status a question of fact); *Armco Steel Corp. v. Isaacson Structural Steel Co.,* 611 P.2d 507, 514 (Alaska 1980) (reasonableness of notice generally a question of fact).

9. *Dyrdal,* 672 N.W.2d at 584–85 (citing *John D. Stump & Assocs., Inc. v. Cunningham Mem'l Park, Inc.,* 187 W.Va. 438, 419 S.E.2d 699, 706 (1992) and *Koch Indus.,* 918 F.2d at 1212–13).

10. *See Gyurkey v. Babler,* 103 Idaho 663, 651 P.2d 928, 931 (1982); *Lehn's Court Mgmt. v. My Mouna Inc.,* 837 A.2d 504, 507 (Pa.Super.2003).

11. *See Gyurkey,* 651 P.2d at 931–32 (all terms and entire offer must be communicated but copy of offer ordinarily sufficient so long as it contains full agreement between seller and third party); *Dyrdal,* 672 N.W.2d at 584 (acceptable for certain information to be missing if sufficient information for right-holder to determine if he is interested in exercising right).

12. *Gyurkey,* 651 P.2d at 932.

absence of these details does not leave the essential terms of the transaction unclear. The essential terms were that Coates would purchase a twenty-five percent interest in the property in exchange for a twenty-five percent interest in the retail store that Coates agreed to operate in the building to be constructed on the property. Coates, Trucano, and Landvik would jointly apply for a loan to develop the building on the property. It was not clearly erroneous for the trial court to find that these core terms were sufficiently definite to enable Roeland and Flamee to determine whether they were interested in matching the terms.

Roeland and Flamee argue that there was no way for them to know how certain terms would ultimately be defined and implemented. For example, the MOU contained a term providing that should the potential buyer, Coates, open any additional retail stores in Juneau, Trucano and Landvik would also get a twenty-five percent interest in those, but the types of items that would be sold in the stores are not specified. Roeland and Flamee raise many other questions, including how certain valuations were arrived at and the timing for applying for bank financing. However, there is no reason to believe that Roeland and Flamee did not have sufficient information to decide whether they were interested in the same basic type of transaction. And as discussed in the next section, if they were confused as to which terms were material and which were mere conditions, or wanted the details filled in, it was their obligation to ask questions and seek information that would clarify these details.

**2. Roeland and Flamee did not investigate the meaning of the terms of the MOU, raise any of the questions they now raise, or attempt to submit a similar offer.**

■■■ "Once a landowner reasonably discloses the terms of an acceptable third-party offer, 'the holder of the right of first

refusal has a duty to undertake a reasonable investigation of any terms unclear to him.' "[13] A right-holder may fulfill this duty to investigate by asking about the specific unclear issues, seeking additional information, or advising the seller that the right-holder considers the notice insufficient, vague, or ambiguous.[14]

Roeland and Flamee communicated their general dissatisfaction with the MOU in their April letter to Trucano's attorney. They argue now that communicating their dissatisfaction was an indication that they considered the MOU insufficiently clear and that their dissatisfaction should have been interpreted as a request for more information. They also argue that, because the MOU was unenforceable, they could not have been in a position to match it. We disagree.

The superior court found, based on the letter's text, that "it is difficult to interpret this letter as anything but a rejection of any transfer that would entail a partner-type arrangement." The court also found that Roeland and Flamee "could have but did not clearly inquire as to whether or how they could meet Coates' offer." Finally, the trial court found that the parties to the MOU intended to be bound by it and that the failure to specify details such as the number of stores or merchandise to be sold reflected a mutual understanding that the parties would "take certain calculated risks in exchange for certain calculated advantages." These findings are not clearly erroneous.

■■■ Here, as they admit, Roeland and Flamee could have attempted to submit a competing equivalent offer, but did not do so. Where a commercial seller has received a unique offer that a right-holder could not exactly duplicate, we agree with courts characterizing the submission of the offer to the right-holder as an invitation to the right-holder to submit a commercially equivalent offer.[15] The right-holder may propose comparable terms to the original offer which are

---

**13.** *Dyrdal*, 672 N.W.2d at 585 (quoting *Comeaux v. Suderman*, 93 S.W.3d 215, 221 (Tex.App. 2002)).

**14.** *See id.* at 586; *Koch Indus. Inc. v. Sun Co.*, 918 F.2d 1203, 1213 (5th Cir.1990).

**15.** *See Prince v. Elm Inv. Co.*, 649 P.2d 820, 826 (Utah 1982).

possible for him to meet and which would meet the seller's commercial interests.[16] The seller then has a duty to use commercially reasonable standards to evaluate the two offers. For these reasons, the right of first refusal is not illusory.

█ "[T]he owner of property subject to a right of first refusal remains master of the conditions under which he will relinquish his interest, as long as those conditions are commercially reasonable, imposed in good faith, and not specifically designed to defeat the preemptive rights."[17] Therefore, where—as here—the right of first refusal does not specify that the third-party offer must be in cash, we give effect to the owner's right to sell his property for whatever he wishes. There was no obligation to provide a cash offer.[18] Roeland and Flamee undertook no inquiries or attempts to negotiate a commercially equivalent offer. Accordingly, they failed to exercise their right of first refusal.

### B. The Trial Court Did Not Err in Ruling that Roeland and Flamee Are Estopped from Claiming Breach of the Right of First Refusal.

█ The trial court found that Roeland and Flamee represented to Trucano that they were waiving their right to attempt to meet Coates's offer, and Trucano relied on this representation in carrying out the terms of the MOU. We considered the question of estoppel in the context of the right of first refusal in *Foster v. Hanni*,[19] where we held that equitable estoppel applies where (1) a right-holder has knowledge of the terms of a third-party offer, (2) the right-holder apparently waives that right, and (3) the seller reasonably relies on this waiver.[20] In that case, a seller communicated an offer to the right-holder, and the right-holder declined it. The seller later offered to finance the purchase if the third-party purchaser could not get bank financing, but did not communicate that offer to the right-holder. The superior court granted summary judgment to the right-holder. Although we agreed with the superior court that the offer to finance the purchase was a second offer that the seller should have communicated to the right-holder, we reversed because there were disputed facts about whether the right-holder actually knew about the second offer, and might have waived his right. In reversing, we held that an implied waiver occurs "where the course of conduct pursued evidences an intention to waive a right, or is inconsistent with any other intention than a waiver, or where neglect to insist on the right results in prejudice to another party."[21]

As noted above, the trial court found that Roeland and Flamee waived their right of first refusal. The court based this finding in part on their statements in the text of the April 2002 letter refusing to enter a partnership-type arrangement and in part on their failure to investigate that approach and their demand of a cash offer to which they had no right. Their letter denying that the MOU could satisfy their right of first refusal, and stating that the MOU "has nothing to do with a Right of First Refusal," demonstrated Roeland and Flamee's incorrect understanding of their right of first refusal. And they

---

16. *See West Texas Transmission, LP v. Enron Corp.*, 907 F.2d 1554, 1566 (5th Cir.1990) (where third-party offer contains terms peculiar to relationship between third party and property owner that the right-holder could not possibly meet, an exception to strict conformity requirement for acceptance to offer exists, and right-holder may make variations not constituting a substantial departure from the original offer) (citing *Prince*, 649 P.2d at 825; *Matson v. Emory*, 36 Wash.App. 681, 676 P.2d 1029, 1032 (1984); *Brownies Creek Collieries, Inc. v. Asher Coal Min. Co.*, 417 S.W.2d 249, 252 (Ky.1967)).

17. *Id.* at 1563.

18. *See id.* at 1564 (citations omitted). We note that Roeland and Flamee also claimed in their April 2002 letter that they could not exercise

their right of first refusal until they were given "exact figures." The trial court reasonably interpreted that statement in light of the remainder of the letter to mean that they were insisting on a cash offer. But they did not have the right to insist on a cash offer because their right of first refusal did not limit the forms that property transfers could take.

19. 841 P.2d 164 (Alaska 1992).

20. *See id.* at 171.

21. *Id.* (quoting *Milne v. Anderson*, 576 P.2d 109 (Alaska 1978)).

waived that right when they stated that they "do not have any intention to become traders" and "do not have any interest" in being partners with Trucano. The superior court's conclusion that Roeland and Flamee waived their right to enter a business arrangement with Trucano was not error.

Roeland and Flamee's testimony indicated that they understood the basic terms of the proposed transaction as set out in the MOU, did not want it, and mistakenly believed that their contract gave them the right to insist on a cash price offer. And it is undisputed that (1) Roeland and Flamee waited to bring suit until after Trucano and Coates consummated their agreement in full, completed the building on the property, and opened the retail business in the building, and (2) this delay was prejudicial. The trial court did not err with respect to either its legal interpretation of the letter or its factual findings that Roeland and Flamee had knowledge of the terms of the offer to Coates, that they waived their right of first refusal, and that Trucano reasonably relied upon that waiver.

## C. The Trial Court Did Not Err in Finding that Trucano and Landvik Acted Fairly and in Good Faith.

 Bad faith in right of first refusal transactions is not found where a party undertakes an act permitted by the contract, even if the motivations are unpleasant.[22] Rather, it is typically found where the seller does not have a legitimate interest in the terms of the third-party offer, deliberately omits terms in relaying the offer to the rightholder, or does not deal at arms length with the third-party offeror.[23] Roeland and Flamee's primary argument is that the trial court should have seen the seven million dollar value estimate as "pure fabrication," "designed to frustrate Roeland and Flamee's first refusal rights." But they do not point to any evidence showing that the trial court's finding was clearly erroneous, and the trial court credited Trucano's and Landvik's testimony that they followed a particular method

**22.** *Stevens v. Foren,* 154 Or.App. 52, 959 P.2d 1008, 1011 (1998).

**23.** *See id.; see also Prince v. Elm Inv. Co.,* 649 P.2d 820, 824 (Utah, 1982) (decision as to time

of calculating that value and believed it to be an educated estimate. We see no basis upon which to hold that the trial court's finding is clearly erroneous.

## D. The Trial Court Did Not Err in Ruling that the 2004 Transfer to the LLC Was Not a Sale Subject to Roeland and Flamee's Right of First Refusal.

 Roeland and Flamee argue that the actual 2004 transfer of the property from Trucano Construction Company to the A & J Building LLC constituted a new sale that should have again triggered their right of first refusal to the remainder of the property. The trial court ruled that the transfer was a "matter of convenience" and a mere matter of form, and did not alter the balance of control over the property. We agree with the trial court's analysis of this issue.

In the actual transfer of the property, ownership of the property changed from the originally proposed seventy-five percent Trucano Construction Company and twenty-five percent Coates to one hundred percent in A & J Building LLC. But Trucano controls seventy-five percent of the LLC, and Coates and the Jethanis control the remainder. The superior court ruled that Roeland and Flamee retain the right of first refusal with respect to seventy-five percent of the property if a sale occurs. Trucano concedes that any sale of the property by the LLC would be subject to Roeland and Flamee's first refusal rights as to seventy-five percent of the property. We interpret the superior court's ruling and Trucano's concession to be that Roeland and Flamee's right of first refusal is for a seventy-five percent undivided interest in any portion of the property intended for sale by the LLC. Thus Roeland and Flamee's situation is the same as originally contemplated in the MOU, and the 2004 transfer did not trigger their right of first refusal.

or terms under which owner will sell are his exclusive prerogative and no bad faith if commercially reasonable); *Matson v. Emory,* 36 Wash.App. 681, 676 P.2d 1029, 1032 (1984).

In *Prince v. Elm Investment Co.,*[24] the Utah Supreme Court summarized the case law and developed a four-part test that the superior court applied here. A sale occurs under the *Prince* test when there is a transfer "(a) for value (b) of a significant interest in the subject property (c) to a stranger to the [agreement] (d) who thereby gains substantial control over the [subject] property."[25] Typically a transfer between corporations, partnerships, or individuals to another form of organization involving the same parties does not result in a "significant transfer of ownership or control to an unrelated third party" and therefore is not a sale.[26] Where individuals transferred property to their own wholly-owned corporation, the Colorado Supreme Court observed that in essence, the owners had sold the property to themselves.[27] There was no arms' length transaction typical of open market sales between strangers.[28] The Wyoming Supreme Court requires an "actual change in control."[29]

In applying the *Prince* test, we look first to the third and fourth factors, because they are dispositive: The transfer of the property to the LLC did not involve a sale to a stranger who thereby gained substantial control over the property. After the transfer to the LLC, Trucano continued to have substantial control over the property, just as he had before the sale. Under the LLC agreement an LLC decision requires seventy-five percent majority vote and Trucano held seventy-five percent of the LLC voting interests.

Thus, although there was a transfer for value (factor 1) of a significant interest in the subject property (factor 2), and although there was a new owner (factor 3), there was no transfer of substantial control to a stranger to the property because Trucano owned seventy-five percent of the LLC, and Coates and the Jethanis, through their prior contractual interest in the property, owned the balance of the LLC.[30] Although we do not find this transaction to have been a sale for purposes of the right of first refusal, Roeland and Flamee's first-refusal rights remain intact as to a seventy-five percent undivided interest in the property because when the LLC obtained the property it was still burdened by the right.

Roeland and Flamee raise two final points that they argue should lead this court to hold that the trial court's ruling was legally incorrect.[31] Neither was raised below and both were therefore waived.[32]

## V. CONCLUSION

Because Roeland and Flamee were provided with adequate notice of a proposed sale to a third party of a twenty-five percent interest in the disputed property, and because Roeland and Flamee waived their legal right to attempt to match the terms and did not investigate any unclear terms, we AFFIRM the trial court's ruling that there was no breach of the right of first refusal or the implied covenant of good faith with respect to the 2002 MOU. Because Trucano Construction Company deeded the disputed property

**24.** 649 P.2d at 823.

**25.** *Id.; see also Belliveau v. O'Coin,* 557 A.2d 75, 79 (R.I.1989).

**26.** *Creque v. Texaco Antilles Ltd.,* 409 F.3d 150, 153 (3d Cir.2005).

**27.** *See Kroehnke v. Zimmerman,* 171 Colo. 365, 467 P.2d 265, 267 (1970).

**28.** *Id.*

**29.** *McGuire v. Lowery,* 2 P.3d 527, 532 (Wyo. 2000).

**30.** Indeed it seems likely that the 2004 transfer might fit within the express exception in the right of first refusal for a "sale of stock in the company or the property." The final structure of the transaction not only was a matter of convenience to effectuate the transaction contemplated in the MOU, it replicated a sale of stock-at the conclusion of the transaction the property was owned by an entity itself held by multiple owners, just as if Trucano had sold twenty-five percent of his interest in Trucano Construction Company in return for a twenty-five percent interest in Alaska–Juneau LLC.

**31.** They argue (1) that the fiduciary duty that Trucano owes to the other members of the LLC limits his decision-making more than it was limited under the MOU, and (2) that Trucano could transfer significant control of the property without the LLC selling the property.

**32.** *See Brooks v. Brooks,* 733 P.2d 1044, 1053 (Alaska 1987).

to the LLC Trucano controlled to effectuate the transaction proposed in the MOU, and Roeland and Flamee's rights with respect to the remaining undivided seventy-five percent interest in the property are essentially the same, we also AFFIRM the trial court's ruling that the 2004 transaction was not a sale that triggered Roeland and Flamee's right of first refusal.