BOLGER, Chief Justice.
I. INTRODUCTION
For several years two condominium owners withheld a portion of their dues in protest. Then beginning in 2014, they sent the condominium association several payments, with instructions to apply them to recent debts and current dues. In this appeal the owners argue that they accrued no debts within the statute of limitations because their payment directives were binding. But we agree with the superior court's conclusion that these payment directives were not effective because the governing declaration allowed the association to apply any payments to "the oldest balance due." We affirm the superior court on this issue and on the other issues the owners raise in this appeal.
II. FACTS AND PROCEEDINGS
A. Facts
Whitestone Estates is a ten-unit condominium, adjacent to Ptarmigan Boulevard, a public street, in Eagle River. The condominiums are single-family homes on large parcels of land. Units 1 and 2 access Ptarmigan Boulevard by a short, paved drive; units 3 through 10 access Ptarmigan Boulevard by a longer drive.
Craig Black, a member of the Alaska Bar who has represented himself and his wife, Camille Brill, (collectively the Blacks) throughout this litigation, purchased unit 1 in May 2002. Whitestone has assessed monthly dues of $100 to pay for the maintenance of both drives, mostly snow removal, since before the Blacks purchased their unit. In 2004, relying on a legal opinion he obtained as president of the board of the condominium *789 association,[1] Black claimed that this arrangement violated the condominium's governing declaration. He proposed an alternative approach: that each unit owner pay the percentage of the annual snow removal expenses that corresponded to the portion of paved area within the association that serviced his or her unit. The unit owners voted to reject this proposal in 2005. But the Blacks nonetheless began withholding a portion of their assessed dues, paying only what their share would have been under the rejected formula.
In 2011 Whitestone sought an opinion from a second attorney about its dues structure. This attorney concluded that the main drive was a common element and that the association's dues structure was permissible under the declaration. Nonetheless the Blacks continued to withhold a portion of their assessed dues until 2014.
On February 6, 2014, the Blacks sent a letter to all unit owners announcing their intent to end their dues protest. The letter explained that an enclosed check for $3,554.56 and an earlier check for $265.44 "equal the sum of all monthly association assessments for the 50 months from January 2010 through this month, with our intention being to resume regular $100 monthly payments for the foreseeable future." The Blacks clarified to the association's treasurer in an email that they intended these payments "to cover the $3,800.00 that'[d] been assessed beginning January 2010."
The treasurer then sent an email to all unit owners on March 22, 2014, shortly before that year's annual meeting, saying that his "records show everyone is paid through 12/31/2013 or further." At the annual meeting later that month, the owners voted to disregard the Blacks' directive and instead apply the lump-sum payment to the couple's oldest debts first. The Blacks did not object, either at the meeting or afterwards.
From then on the Blacks sent monthly $100 checks to Whitestone with instructions that they be applied to their current dues. Whitestone cashed these checks until sometime after litigation began, at which point they started returning them to the Blacks.
B. Proceedings
1. Pre-trial motions
Whitestone filed a complaint for lien foreclosure in March 2016, seeking to recover $4,714.08 in unpaid assessments and fees from the Blacks, interest on the unpaid amounts, and "full attorney's fees."
In their answer the Blacks asserted a statute of limitations defense, alleging that they had fully paid all debts owed to Whitestone for the previous three years and that recovery on any debt older than that was time-barred.[2] The Blacks also filed numerous counterclaims. They alleged that Whitestone had amassed surplus funds that it was required to distribute to unit owners, that Whitestone had held meetings without giving the Blacks proper notice, and that Whitestone had not prepared and approved minutes for its board meetings, all in violation of the declaration. The Blacks requested that the court invalidate every action taken at a meeting for which "ample advance notice was not first given," direct Whitestone to "generate and approve minutes" for each of its meetings since January 1, 2009, and award money damages in the amount of the Blacks' pro rata share of the alleged surplus. The Blacks also requested attorney's fees and punitive damages, alleging that Whitestone willfully failed to comply with the requirements of Alaska's Common Interest Ownership Act.[3]
Whitestone filed an amended complaint in which it explicitly addressed Black's statute of limitations defense, claiming that the Blacks' payment directives were ineffective, that it had applied their payments to their oldest debts first, and that the debts on which it sought to recover were thus not older than three years.
*790 Whitestone also sought declaratory judgment to determine whether the owners of units 1 and 2 could legally be required to pay assessments for the upkeep of the main drive. It alleged that the Blacks had "asserted for years" that they were not required to pay for the maintenance of the drive, while also asserting that Whitestone should be responsible for the maintenance of the smaller drive that served units 1 and 2. The Blacks moved to dismiss this claim for declaratory relief, arguing that no actual controversy existed over the drives issue because they had abandoned their dues protest in 2014. The superior court denied this motion. Whitestone then filed a motion for partial summary judgment on its declaratory judgment claim, which the superior court eventually granted.
2. Trial and post-trial orders
The case proceeded to a five-day bench trial on the remaining issues in late August 2017. Whitestone presented the testimony of multiple unit owners, while the Blacks called a former unit owner who had been Whitestone's treasurer when they made their 2014 payment. Both Black and Brill also testified. In their closing argument, the Blacks agreed to the dismissal of their counterclaims for an injunction, based on the failure to provide notice of meetings, and for punitive damages, saying that they did not "believe there's evidence sufficient to award either of those."
After the parties gave their closing arguments, the court issued a decision on the record. The court stated that "[t]his isn't a close call" and resolved all the issues in Whitestone's favor, awarding it $11,518.20 in damages. It explained that this was "largely a credibility case," and found "every one of [Whitestone's] witnesses to be very, very credible." On the other hand, the court said that it did not find Black's explanations of his actions to be credible and found that Black was "trying to sneak up on the association," which the court considered an act of bad faith.
The court found that Black had "created ... a decade of animosity and mistrust amongst [himself] and [his] neighbors and ... w[as] simply not willing to abide by the declaration" and accept the 2005 vote that rejected his alternative dues structure. It explained that it concluded from testimony that Black had "bullied everybody with [his] position as a lawyer" and that this demeanor was evident in his filings and presentation before the court. The court further explained that despite Black's posturing, his legal arguments were not as strong as he believed: "[T]he facts establish that [he was] very assertive and self-confident with the association, but under the light of day here in this courtroom, [he] had no substance to that assertion."
The Blacks filed a motion for reconsideration, which the superior court denied with a written order. In it the court explained the basis for its decision that Whitestone's claims were not time-barred. It concluded that the Blacks' payment directives were not binding on the association for two reasons: first that they could not override a provision of the declaration that gave "Whitestone ... the right to apply payments received to the oldest debts first," and second that Black had breached a fiduciary duty to the association by not "warn[ing] his fellow board members and unit owners what the effect of ignoring his payment directives might be" while he was a board member from 2005 to 2009. For these reasons, the superior court found that "while the Blacks may have made payment directives, they made no effective payment directives." (Emphasis in original.)
The superior court issued its final judgment and a decree of foreclosure in October 2017 and granted Whitestone full attorney's fees in January 2018. In all, it granted Whitestone a total monetary judgment of $132,670.16: $11,518.20 for unpaid assessments, associated late fees, and interest (less $4,382, which the Blacks had already paid into the court registry) and $125,533.96 in attorney's fees and costs. The court placed a foreclosure lien in that amount on the Blacks' property.
The Blacks appeal.
III. DISCUSSION
The Blacks argue that the superior court erred when it determined that their payment directives were ineffective, found that they *791 were not entitled to recover alleged surplus funds from the association, denied their motion to dismiss the declaratory judgment claim, included a disputed special assessment in Whitestone's award, and determined that Whitestone's attorney's fees were reasonable. We address these arguments in turn.
A. The Superior Court Did Not Err When It Concluded That The Blacks' Payment Directives Were Not Binding On Whitestone.
The superior court concluded that the Blacks' payment directives to Whitestone were ineffective. It concluded that Whitestone thus had the authority to apply the couple's payments to their earliest accrued debts, meaning that its claims were not time-barred by the statute of limitations. The court explained that the declaration gave Whitestone "the right to apply payments received to the oldest debts first" and that the Blacks "did not have the right to override that provision with payment directives." The superior court also found, in the alternative, that Black had breached a fiduciary duty to Whitestone while a board member, from 2005 to 2009, by not warning it about the effect of disregarding his payment directives. We conclude that Whitestone had the authority to disregard the Blacks' payment directives under the express terms of the declaration. We affirm the superior court's order on this basis and thus need not address its finding that Black breached a fiduciary duty.
The superior court's order relies on the terms of the declaration. We review the "interpretation of contract language de novo."[4] Under this standard of review, we assess the expectations of the parties to the contract by "examining the language used in the contract, case law interpreting similar language, and relevant extrinsic evidence, including the subsequent conduct of the parties."[5]
The superior court's analysis of the effectiveness of the Blacks' payment directives is based on § 258 of the Restatement (Second) of Contracts. In particular it relied on comment a to § 258, which states that "[t]he obligor cannot, however, effectively direct an application in breach of a contract with the obligee as to how performances should be applied if the contract is specifically enforceable." The Blacks argue in their briefing that the declaration is not specifically enforceable, and thus the Restatement's rule does not apply.
We find it unnecessary, however, to decide whether the declaration is a specifically enforceable contract such that the comment applies. Although we have favored the Restatement's approach to payment directives,[6] it provides only the default rule; where an express term of the contract conflicts with the general rule of the Restatement, the contract controls.[7] And here the express terms of the declaration control how payments may be directed.
The Whitestone declaration provides that "[a]ny payments received by the Association in the discharge of a Unit Owner's obligation may be applied first to interest, late charges, collection costs, fines, and fees, and then to the oldest balance due from the Unit Owner for Common Expense assessments." The Blacks argue that the declaration's use of the word "may" means that the ability to apply payments received to a debtor's earliest obligation *792 is discretionary, not mandatory. They thus contend that the declaration does not allow Whitestone to disregard payment directives, but rather gives it flexibility only when the debtor has provided no instructions. We disagree. The declaration's use of the word "any" indicates that Whitestone's authority extends over all payments, even those accompanied by payment directives. This grant of authority would be meaningless under the Blacks' construction; the declaration would merely restate the default rule that creditors may apply a payment as it wishes absent direction from the debtor.[8]
Extrinsic evidence, in the form of the parties' conduct, supports this interpretation.[9] Multiple unit owners testified that Whitestone had always applied payments to the oldest debts first. And in a 2011 email, Black himself said that Whitestone's policy was to always apply payments to the oldest debt first.[10] We conclude, therefore, that the declaration granted Whitestone the authority to disregard the Blacks' directives and apply their payments to their earliest accrued debts first. And because the Blacks' payment directives were not binding, their debts were not beyond the statute of limitations.
B. The Superior Court Did Not Err When It Concluded That Leftover Funds In Whitestone's Account From 2005 To 2014 Were Reserves.
Alaska Statute 34.08.450 states:
Unless otherwise provided in the declaration, surplus funds of the association remaining after payment of or provision for common expenses and prepayment of reserves must be paid to the unit owners in proportion to common expense liabilities or credited to them to reduce future common expense assessments.
The Whitestone declaration provides that the association "shall establish a reserve fund in an amount at least equal to the projected assessments for a two-month period for each Unit in the Common Interest Community." It further provides: "The Association shall maintain the reserve funds in a segregated account to meet unforeseen expenditures or to acquire additional equipment or services for the benefit of the Unit Owners. Any payments to this fund shall not be ... refundable." Neither the declaration nor the statute defines surplus or reserve funds.[11]
Whitestone closed the separate account it maintained for reserves in 2005, and from that year to 2015, it had only one bank account. After being served with Whitestone's complaint, the Blacks filed a counterclaim alleging that the association maintained no reserves during those years, and that it should have distributed any leftover funds to the owners as surplus. The superior court found that any funds left over at the end of budget years 2005 through 2014 were reserve funds, even though they were in a commingled account, and that the Blacks were not entitled to their distribution.
The Blacks argue that this finding was erroneous. This issue turns on the definition of "reserves" as used in the declaration. We "review the superior court's interpretation of contract language de novo."[12] The declaration *793 specifies that the purpose of reserve funds is to "meet unforeseen expenditures or to acquire additional equipment or services for the benefit of the Unit Owners." Any funds set aside for that purpose are therefore reserves under its terms. This is the case regardless of whether they were segregated in a separate account.[13]
We must next ask, then, whether the excess funds in Whitestone's single account from 2005 to 2014 were set aside to pay for unforseen expenditures or to buy equipment or services to benefit the owners. The superior court found that they were set aside to pay for road maintenance, a service to benefit the owners. We review this factual finding for clear error.[14]
The superior court's finding is supported in the record. The court explained that "[e]very single witness testified about how the purpose of the extra funds ... in the bank account" was to pay for "future road maintenance, heavy duty road maintenance." Whitestone's witnesses consistently testified that the leftover funds were for road repairs. The superior court found "each and every one of [Whitestone's] witness[es] to be very, very credible," and did not credit Black's testimony about the challenged funds.[15]
The Blacks argue that five resale certificates introduced at trial prove that Whitestone had no reserve funds during the relevant period, and contend that it was clear error to disregard them. Only two of these resale certificates support the Blacks' argument. The remainder merely say, "For the Associations reserves for capital expenditures, see the attached financial statement," which lists the association's sole account.
Under "Capital Reserves," a 2010 resale certificate says: "At present, the balance of the Association's bank account is not reserved or designated for any particular purpose or specified project, including capital expenditures." And a 2014 resale certificate says that "[i]n the past, the Association members have opted to keep any reserve account(s) at a minimum." While these two certificates support the Blacks' argument, they are not so overwhelming as to leave us with a definite and firm conviction that the superior court made a mistake.[16] We thus conclude that the superior court did not err when it found that the funds in question were reserves.
C. The Superior Court Did Not Err When It Denied The Blacks' Motion To Dismiss Whitestone's Claim For Declaratory Relief.
In addition to its contract damages, Whitestone sought declaratory relief, asking the superior court to determine whether the drives were common elements or limited common elements under the declaration. Whitestone alleged that a controversy existed as to this question because the Blacks had premised their dues protest on their belief that the drives were limited common elements. The Blacks moved to dismiss this claim, asserting that Whitestone had failed to plead the existence of an actual controversy.[17]
*794 The superior court denied this motion and eventually granted Whitestone declaratory relief. And in its fee-award order, the superior court stated that it "has no doubt that, as Whitestone argues, absent that successful [declaratory judgment claim] Black would have continued avoiding paying his Association obligations." The Blacks argue that no controversy existed and that it was legal error to deny their motion to dismiss. We review the denial of a motion to dismiss de novo.[18] "Under our case law, the 'actual case or controversy' language [in the statute providing for declaratory relief] encompasses a number of more specific reasons for not deciding cases, including lack of standing, mootness, and lack of ripeness."[19]
The Blacks argue that because they abandoned their dues protest in 2014, Whitestone's claim for declaratory judgment was both moot and unripe. But they continued to dispute Whitestone's position on the drives even after they made the 2014 payment. Whitestone introduced evidence that Brill stated at a 2016 owners' meeting that she thought a special assessment to pay for repairs of the main drive was "in contradiction to the Declaration and will probably be a matter of litigation."
Whitestone also introduced two 2016 letters sent to its attorney by Black. In the first, Black said that the "common element/limited common element distinction becomes an issue when it comes to the maintenance of the[ ] drives." Referring to the main drive, Black said: "We object to being assessed to pay for non-common features of other owners' units. As a result, the declaration, state law, prior history, and fundamental fairness should, at a minimum, excuse ... us ... from having to contribute toward that work." In the second letter, Black, again referring to a special assessment to pay for maintenance of the main drive, said: "[Whitestone] should not expect us to pay [for] an assessment like the one it imposed last month. If work needs to be done, it should be paid for by the homes that will benefit from that work, and that's not us."
These statements by Black and Brill show that they were threatening action over the drives issue even after the onset of litigation in this case. If a defendant had the power to moot a case by simply disavowing the challenged conduct in the course of litigation, "the courts would be compelled to leave the defendant free to return to [their] old ways."[20] Given this, we conclude that the superior court did not err when it denied the Blacks' motion to dismiss and proceeded to the merits of Whitestone's claim for declaratory relief.
D. The Superior Court Did Not Err By Including In Whitestone's Judgment A $1,100 Special Assessment Not Listed In A Statement Provided To The Blacks.
Alaska Statute 34.08.470(h) provides that a condominium association "shall furnish to a unit owner a statement setting out the amount of unpaid assessments against the unit" upon written request. It also provides that "[t]he statement ... is binding on the association, the executive board, and each unit owner."[21] On October 31, 2016, Black requested such a statement from Whitestone. Whitestone levied a $1,100 special assessment from each owner on November 1, to be due on November 19. Whitestone supplied Black with a statement on November 7, which did not include the special assessment.
The Blacks argued in their motion for partial summary judgment and at trial that Whitestone could not collect this assessment because it was not included in the November 7 statement. The superior court included the $1,100 special assessment and associated late fees in Whitestone's judgment. The Blacks *795 argue that its inclusion was erroneous under the clear language of AS 34.08.470(h).
The minutes of the November 1 meeting at which the assessment was levied show that Black was present, and the owner who chaired the meeting sent an email afterwards to all the owners announcing the new assessment. Black testified that he received this email. We must determine, then, whether AS 34.08.470(h) relieves a unit owner of the obligation to pay an assessment that is omitted from a statement provided by the association even when that owner has actual knowledge of the assessment. This is a question of statutory interpretation, to which we apply our independent judgment.[22] "We construe statutes according to reason, practicality, and common sense, considering the meaning of the statute's language, its legislative history, and its purpose."[23]
Generally, AS 34.08.470 governs the authority of a condominium association to attach liens to and recover against units with unpaid assessments. Under AS 34.08.470(a) the association automatically has a lien on a unit when an assessment becomes overdue. The legislative history shows that this section was intended to grant condominium associations greater power and streamline the process by which they could collect unpaid assessments from unit owners.[24] Given this streamlined process, AS 34.08.470(h) ensures that unit owners have the ability to obtain reliable information about their potential liability.[25] That subsection's assurance that the statement given to an owner is "binding on the association" prevents the association from surprising that owner by collecting on an assessment of which he or she had no knowledge. Taken as a whole, this statutory scheme serves the dual purpose of empowering the condominium association to easily collect on its debts and protecting the unit owner by making accurate information about his or her unit available on demand.
However, when a unit owner already has actual knowledge of an assessment, this protection is unnecessary. It would be contrary to the purpose of AS 34.08.470 to allow a unit owner who already knows about an assessment to use its omission from a statement provided by the association as a means to relieve himself or herself of the obligation to pay it. The Blacks do not argue that the November 1 special assessment was improperly levied. And the record shows that Black had actual knowledge of that assessment when Whitestone sent him a statement omitting it on November 7, and conceded at oral argument that its omission did not prejudice him and Brill. Under these circumstances we conclude that the association's failure to list the assessment in the statement did not void the Blacks' obligation to pay it, and hold that the superior court did not err when it included the $1,100 special assessment and associated late fees in Whitestone's judgment.
E. The Superior Court Did Not Abuse Its Discretion When It Determined That Whitestone's Attorney's Fees Were Reasonable.
The superior court awarded Whitestone full attorney's fees in the amount of $124,043. It found that a full fee award was warranted both under the declaration, which entitles the prevailing party to "recover ... actual attorneys' fees," and as an *796 enhanced fee award under Alaska Civil Rule 82(b)(3). The Blacks do not dispute that the declaration entitles the prevailing party to full fees, but they argue on appeal that Whitestone's fees were unreasonable.[26] "We review an attorney's fee award for abuse of discretion, reversing the award only if it is 'arbitrary, capricious, manifestly unreasonable, or the result of an improper motive.' "[27]
The Blacks argue that Whitestone's fees were not reasonable because they were much higher than the amount in dispute.[28] Whitestone's fee award is many times larger than the judgment it received, but the amount in dispute does not impose an upper limit on the amount the prevailing party may recover in fees.[29] The superior court made an express finding that the Blacks' litigation conduct was the cause of Whitestone's high fees. It explained that "Black ... seemed to be taking affirmative, repeated, consistent steps to maximize the fees Whitestone was having to incur." (Emphasis in original.) For example, it noted that the Blacks had rejected two pretrial settlement offers from Whitestone, explaining that "it appears to this court that Black seemed intent on litigating regardless of any offer, almost as if he was getting enjoyment from raising every possible issue and every argument, no matter how strained, no matter how unworthy of litigation." (Emphasis in original.) The superior court eventually found that "the Blacks engaged in non-stop vexatious and bad faith litigation."
The superior court's characterization of the Blacks' approach to the litigation is supported by the record. For example, the couple filed various counterclaims in response to Whitestone's complaint. Among these were claims that Whitestone failed to provide proper notice of its board meetings and that the Blacks were entitled to punitive damages for Whitestone's "willful failure to comply" with the statute governing condominium associations. But the Blacks produced no evidence to support these claims and eventually abandoned them in their closing argument at trial.
We have previously upheld an award of full fees where the superior court found that "the action was 'frivolous and brought to harass the defendants' " because the plaintiffs produced no evidence to support their claim.[30] Moreover, we have explained that "the superior court [is] in the best position to evaluate the defendants' demeanor and credibility" in the fee-award context.[31] Finally, because the Blacks maintained the punitive damages claim until the close of trial, it would have been reasonable for Whitestone to assume that there was more at stake than its contract claims. The superior court's discussion of the Blacks' litigation conduct provides an adequate basis for its determination that Whitestone's fees were reasonable; we conclude that it did not abuse its discretion.
IV. CONCLUSION
We AFFIRM the superior court's decision in all respects.

Black was a board member from 2003 to March 2009.

Alaska Statute 09.10.053 provides that "[u]nless the action is commenced within three years, a person may not bring an action upon a contract or liability, express or implied" with limited exceptions.

See AS 34.08.670.

Miller v. Fowler , 424 P.3d 306, 311 (Alaska 2018). Both parties agree that the declaration is a contract.

Norville v. Carr-Gottstein Foods Co. , 84 P.3d 996, 1004 (Alaska 2004) (quoting Municipality of Anchorage v. Gentile , 922 P.2d 248, 256 (Alaska 1996) ).

See Jalasko Assocs., Inc. v. Newbery Energy Corp. , 663 P.2d 946, 948 (Alaska 1983) (citing § 259 of the Restatement for the general rule that "permits a creditor to apply a debtor's payment to any of the debtor's obligations, absent direction by the debtor").

Cf., e.g. , In re Grigsby , 127 B.R. 759, 766 (E.D. Pa. 1991) ("This provision [of the contract providing for repayment of interest before principal] need not 'overcome' the general rule, because the general rule applies only in the absence of such a provision."); United Orient Bank v. Lee , 208 N.J.Super. 69, 504 A.2d 1215, 1217 n.1 (1986) ("An exception arises [to the general rule reflected in § 258 of the Restatement] where there is a preexisting agreement with the obligee or a third party directing the application.").

See Restatement (Second) of Contracts § 259 ( Am. Law Inst. 1981). Cf. All. of Concerned Taxpayers, Inc. v. Kenai Peninsula Borough , 273 P.3d 1128, 1139 (Alaska 2012) ("We will construe a statute 'so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant.' " (quoting 2A Norman J. Singer & J.D. Shambie Singer, Sutherland Statutes and Statutory Construction § 46:6 (7th ed. 2007) )).

"[E]xtrinsic evidence may always be received on the question of meaning." Mahan v. Mahan , 347 P.3d 91, 94-95 (Alaska 2015) (quoting Alaska Diversified Contractors, Inc. v. Lower Kuskokwim Sch. Dist. , 778 P.2d 581, 584 (Alaska 1989) ); see also Casey v. Semco Energy, Inc. , 92 P.3d 379, 384 (Alaska 2004) ("The intent of the parties is the primary issue, and their intent can be drawn from extrinsic evidence, especially their express attempts to comply with the contract as they understood it.").

The email reads:
Gang,
My head's spinning.
Since we've always first applied new payments towards past arrearages, I don't see the difference: a person can't be up to date on December 31 and at the same time have an arrearage from a prior year. It's impossible.
Craig[.]

See AS 34.08.990.

Miller v. Fowler , 424 P.3d 306, 311 (Alaska 2018).

The Blacks argued at trial that since the declaration required reserves to be kept in a segregated account, any funds not kept in a segregated account could not be reserves. But Black agreed, when questioned by the superior court, that this argument was circular. The structure of the declaration undercuts this argument as well. It first commands that the association "shall establish a reserve fund," and then in the next paragraph instructs it to "maintain the reserve funds in a segregated account." This indicates that the reserve fund has some defining characteristic other than the fact that it is kept in a separate account.

See Nautilus Marine Enters. v. Exxon Mobil , 305 P.3d 309, 315 (Alaska 2013) ("Where the superior court considers extrinsic evidence in interpreting contract terms ... we will review the superior court's factual determinations for clear error ...." (quoting Villars v. Villars , 277 P.3d 763, 768 (Alaska 2012) )).

"[I]t is the function of the trial court, not of this court, to judge witnesses' credibility ...." Burton v. Fountainhead Dev., Inc. , 393 P.3d 387, 392 (Alaska 2017) (quoting Lentine v. State , 282 P.3d 369, 375-76 (Alaska 2012) ).

See Nautilus Marine Enters ., 305 P.3d at 315 ("A clearly erroneous finding is one which leaves us with a 'definite and firm conviction on the entire record that a mistake has been made.' " (quoting Municipality of Anchorage v. Gentile , 922 P.2d 248, 256 (Alaska 1996) )).

Alaska Statute 22.10.020(g) grants the superior court jurisdiction over declaratory judgment claims only "[i]n [the] case of an actual controversy." See also Jacko v. State , 353 P.3d 337, 340 (Alaska 2015).

Catholic Bishop of N. Alaska v. Does 1-6 , 141 P.3d 719, 722 (Alaska 2006).

Ruckle v. Anchorage Sch. Dist. , 85 P.3d 1030, 1034 (Alaska 2004).

Slade v. State, Dep't of Transp. & Pub. Facilities , 336 P.3d 699, 700 (Alaska 2014) (quoting Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc. , 528 U.S. 167, 189, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000) ).

AS 34.08.470(h).

See State v. Groppel , 433 P.3d 1113, 1116 (Alaska 2018).

Id. (quoting Alaska Airlines, Inc. v. Darrow , 403 P.3d 1116, 1121 (Alaska 2017) ).

Testimony of Gurdon H. Buck, Cmty. Ass'n Inst., Am. Bar Ass'n at 54:3556:34, Hearing on S.B. 44 Before the Sen. Judiciary Comm., 14th Leg., 1st Sess. (Feb. 5, 1985). For example, AS 34.08.470(d) provides, "The recording of the declaration constitutes record notice and perfection of the lien. Further recording of a claim of lien for assessment under this section is not required."

A witness who testified before the Senate Judiciary Committee on behalf of the bill that enacted this section expressed particular concern about the need to inform prospective purchasers about liability associated with units for sale. See Testimony of William L. McNall, Cmty. Ass'n Inst. at 59:09-59:52, Hearing on S.B. 44 Before the Sen. Judiciary Comm., 14th Leg., 1st Sess. (Feb. 5, 1985). Although AS 34.08.590(a)(2) more directly addresses this concern by requiring the seller of a unit to produce a resale certificate disclosing any debts associated with the property, this testimony underscores the importance of making accurate information available.

The Blacks also request that we remand to the superior court to reconsider which party prevailed at trial. It is not necessary to reevaluate the designation of Whitestone as the prevailing party because we affirm the superior court's judgment on damages.

State, Dep't of Health & Soc. Servs. v. Okuley , 214 P.3d 247, 251 (Alaska 2009) (quoting Hughes v. Foster Wheeler Co. , 932 P.2d 784, 793 (Alaska 1997) ).

See Alaska Bar R. 35(a)(4) (identifying "the amount involved and the results obtained" as a factor "to be considered in determining the reasonableness of a fee"); see also Okuley , 214 P.3d at 251 n.13.

See Valdez Fisheries Dev. Ass'n, Inc. v. Froines , 217 P.3d 830, 833 n.19 (Alaska 2009) (explaining that "[w]e have never adopted ... a bright-line rule" that fees in excess of the amount in dispute were unreasonable).

Garrison v. Dixon , 19 P.3d 1229, 1235 (Alaska 2001).

Crook v. Mortenson-Neal , 727 P.2d 297, 306 (Alaska 1986).