*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.gov.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| DAVID L. MEYERS, JAN M. MEYERS, and SKY RANCH AERO SERVICES, LLC, | ) ) ) ) | Supreme Court No. S-18521 |
| | ) | Superior Court No. 3AN-20-08023 CI |
| Appellants, | ) ) | O P I N I O N |
| v. | ) ) | No. 7735 – December 13, 2024 |
| SKY RANCH, INC., | ) ) | |
| Appellee. | ) ) ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Andrew Guidi, Judge.

Appearances: William M. Bankston, John R. Crone, and Suzanne A. Adler, Bankston Gronning Brecht P.C., Anchorage, for Appellants. Sarah A. Badten and Matthew Widmer, Birch Horton Bittner & Cherot, Anchorage, for Appellee.

Before: Maassen, Chief Justice, and Carney, Borghesan, Henderson, and Pate, Justices.

PATE, Justice.

## I.    INTRODUCTION

The developers of an aviation-centric common interest community held special declarant rights associated with a unique lot. The homeowners' association held a right of first refusal on the unique lot. The developers sold the lot, but the deed did

not clearly convey the special declarant rights, and the developers did not inform the homeowners' association that they were transferring the special declarant rights with the sale of the lot.

A dispute subsequently arose between the association and the new owners. The owners sought a declaratory judgment that they held the special declarant rights, that construction on the lot was accordingly not subject to oversight by the association, that they were allowed to rent aircraft facilities on the lot to non-lot owners, and that those non-lot owners could then use the airstrip. The association sought judgment to the contrary and also argued that the community's declaration required the owners of the lot to make tiedowns available on the lot to other members of the community. The superior court granted summary judgment in favor of the association and awarded attorney's fees.

We reverse the superior court's ruling on summary judgment and remand for further proceedings to determine whether the owners of the lot obtained the special declarant rights. We affirm the court's determination that the owners must make tiedowns available to other members of the community. We reverse the court's determination that only lot owners are permitted to use the airstrip and aircraft facilities. We vacate the superior court's award of attorney's fees.

## II. FACTS AND PROCEEDINGS

### A. Facts

#### 1. The Turners develop Sky Ranch and reserve special declarant rights to Lot 13.

Rexford and Ingeborg Turner were the original developers of Sky Ranch at Pioneer Peak, a planned common-interest community in Palmer.[1] Sky Ranch is a

---

[1] *See generally* AS 34.08.

fly-in community built around a commonly owned airstrip.[2] The homeowners association governing the community is a non-profit named Sky Ranch, Inc. (the Association).[3]

A business owned by the Turners, Turner Custom Homes, Inc., originally owned Lot 13, Block 5 in Sky Ranch, referred to in the community's declaration[4] as the "Hanger Lot."[5] Sky Ranch's declaration singles out Lot 13 as unique. The declaration reserves "special declarant rights" that allow the declarant to subdivide Lot 13 and create up to 14 condominium-hangar lots,[6] which may be constructed without the approval of the Association's Architectural Control Committee.[7] The special declarant rights also allow commercial activity on Lot 13, "limited to the sale/lease of tie-down or hanger spaces and the sale of aircraft fuel." The declaration also states that "[o]wners of Lots not adjacent to the runway or a taxiway will be offered, on a first come, first served basis, an assigned tiedown on [Lot 13]."

---

[2] *See* AS 34.08.990(4) (defining "common elements" to include "the real estate within a planned community owned or leased by the association").

[3] *See* AS 34.08.310 (explaining that common interest community must have an "association" whose membership "at all times consists exclusively of all unit owners"); AS 34.08.320 (defining association's powers). Though the statute refers to an association comprised of "unit owners," we refer to association members as "lot owners," which is consistent with the community's usage.

[4] *See* AS 34.08.090 (explaining that creating a common interest community requires "recording a declaration" and "conveying the real estate subject to the declaration to the association").

[5] The declaration uses the term "hanger" instead of "hangar." We use the former term when quoting the declaration.

[6] This provision also states that each subdivided lot would "be considered a separate Lot for all purposes after the plat is recorded."

[7] The declaration requires any construction, additions or alterations to first be approved by the Architectural Control Committee. The Committee assesses the project's location, quality, and whether its design is in "harmony . . . with existing structures."

The declaration provides the Association a right of first refusal to purchase Lot 13. In the event there is a proposed transfer of Lot 13 to "anyone outside the immediate family of [the Turners]," the declaration requires Turner Custom Homes to "notify the Association in writing of the proposed terms of transfer and . . . provide the Association 45 days to purchase the property on identical terms."

### 2. The Meyerses purchase Lot 13.

In 2010 David and Jan Meyers, through Sky Ranch Aero Services, LLC, offered to purchase Lot 13 from Turner Custom Homes for $580,000. Turner Custom Homes informed the Association in writing of the terms of the offer, including the transfer of the special declarant rights. During negotiations the Turners asked the Association to sign a waiver relinquishing its right of first refusal. The Association refused to sign, and the Meyerses ultimately did not purchase Lot 13 in 2010.

Four years later, the Meyerses made a second offer to buy Lot 13. Turner Custom Homes provided the Association with a proposed "Purchase and Sale Agreement." But unlike the offer in 2010, the terms of the agreement made no mention of the special declarant rights. This time, the Association's president signed a waiver relinquishing the Association's right of first refusal. The waiver did not mention the special declarant rights.

The Turners and the Meyerses finalized the sale of Lot 13 by executing a statutory warranty deed. The deed describes two parcels:

> The Grantor(s), Rexford L. Turner, as to Parcel No. 1, and Ingeborg Turner, Parcel No. 2, . . . for and in consideration . . . conveys and warrants to the Grantee(s), Sky Ranch Aero Services LLC, . . . the following described real property:
>
> Parcel No. 1:
>
> Lot 13, Block 5, Sky Ranch at Pioneer Peak, according to Plat No. 98-32, located in the Palmer Recording District, Third Judicial District, State of Alaska EXCEPTING

THEREFROM the Special Declarant described as Parcel No. 2 herein.

Parcel No. 2:

Special Declarant Rights set forth in Article VII, Section 7.1.a of the Declaration of Sky Ranch at Pioneer Peak, recorded on November 21, 2000 at Book 110, Page 0262, and the First Amendment to Declaration of Sky Ranch at Pioneer Peak, recorded on January 10, 2005, at Doc. 2005-000587-0 (Special Declarant Rights), including any right by amendment to subdivide the maximum 14 condominium hangar lots on the Property, each of which will be considered a separate lot for all purposes after the plat is recorded, as it affects the following property; Lot 13, Block 5, Sky Ranch at Pioneer Peak, according to Plat No. 98-32, located in the Palmer Recording District, Third Judicial District, State of Alaska.

The deed was recorded in September 2014. In 2019 the Association amended the declaration to remove its right of first refusal with respect to the sale of Lot 13.

### 3. Disagreements arise between the Meyerses and the Association.

The Meyerses' relationship with the Association soured over the Meyerses' use of Lot 13. The Meyerses did not rent any of the available tiedowns[8] after they purchased Lot 13. Instead, over a period of time, they removed all but three of the tiedowns, which they reserved for personal use.

Between 2019 and 2020, the Association passed a series of resolutions creating both temporary and permanent tiedowns on taxiways near the airstrip. One of these resolutions stated it would "remain in effect until adequate tiedowns are available

---

[8] The declaration and a subsequent amendment variously use tiedown, tie-down, and tie down. When not quoting the declaration or amendment, we use tiedown.

for rental by the [Association's] Membership on Lot 13." The Association promulgated a rental agreement for these tiedowns, setting rent at $25 per month.

In November 2019 the Association amended the declaration to add a definition of "renter," which it defined as an individual "in an active contract with an Association Member for living quarters and/or aircraft parking space(s), in a hanger or outdoors via tie down." This amendment further specified that, "[o]ther than as described herein for Lot 13 Block 5, homeowners may not separately rent tie downs or hangers on their lot to non-HOA members."

Disagreements between the Meyerses and the Association followed. The Association told the Meyerses it had observed construction activity on Lot 13 that had not been approved by the Architectural Control Committee. Citing the special declarant rights, the Meyerses claimed they did not need to seek pre-approval from the Committee for improvements to Lot 13.[9]

The Meyerses also claimed they could lease hangars and tiedowns on Lot 13 to non-lot owners who rented property in Sky Ranch, and that these tenants could then use the airstrip. The Association learned that the Meyerses had leased a residential lot and a hangar on Lot 13 to a couple who did not own a lot in Sky Ranch. The Meyerses had also allowed the same couple to use the airstrip. The Association

---

[9] The Meyerses cited article IX, section 9.8(b), which provides that the "[d]eclarant shall be permitted to construct hanger/condominiums on [Lot 13] without obtaining approval from the Architectural Control Committee." They also cited article VII, section 7.8 which provides: "[N]either the Association nor any Lot Owner may take any action, adopt any rule, make interpretations . . . , or amend this Declaration in a manner that will interfere with or diminish any Special Declarant Right without prior written consent of the Declarant."

maintained that the declaration prohibited non-lot owners from renting hangars or using the airstrip.[10]

## B.    Proceedings

In September 2020 the Meyerses sued the Association seeking a declaratory judgment defining whether and how the Architectural Control Committee could regulate improvements to Lot 13.  The Meyerses also sought a declaratory judgment that they could rent Lot 13 to tenants who did not own lots in Sky Ranch and that those tenants could use the airstrip.

Before the Association answered, the Meyerses filed an amended complaint.  The amended complaint sought a determination that the Meyerses possessed the special declarant rights associated with Lot 13 and that those rights allowed it to lease hangar spaces and tiedowns to non-lot owners.

The amended complaint also explained that the Meyerses had obtained a "Corrective Warranty Deed" signed by the Turners in January 2021.  This corrective deed purported to clarify that the 2014 conveyance included the special declarant rights. The corrective deed was identical to the prior statutory deed, with one exception: the words "EXCEPTING THEREFROM the Special Declarant [rights] described as Parcel No. 2 herein" had been replaced with the words "INCLUDING, BUT NOT LIMITED TO, ALL Special Declarant rights described in Parcel 2 herein."  The Meyerses executed the corrective deed one day after they filed their amended complaint.

The Association answered and counterclaimed.  The Association sought an injunction requiring the Meyerses to offer tiedowns on Lot 13 to qualified lot owners, barring the Meyerses' tenants from to using the airstrip, and requiring the Meyerses to obtain pre-approval from the Architectural Control Committee for improvements on

---

[10]    Article IX, section 9.8(b) provides that "commercial usage shall be permitted on the hanger/condominium Lot, provided said uses are limited to the sale/lease of tie-down or hanger spaces and the sale of aircraft fuel."

Lot 13.  The Association moved for summary judgment on its counterclaims.  It also sought summary judgment that neither the statutory deed nor the corrective deed transferred the special declarant rights.

In response, the Meyerses argued that the definition of "renter" in the 2019 amendment created a genuine dispute of material fact as to whether non-lot-owner tenants could use the airstrip.  They also alleged that the Association had allowed two non-lot owners to consistently use the airstrip.

The superior court granted summary judgment to the Association and denied it as to the Meyerses.  The court found the 2014 statutory warranty deed was unambiguous and did not transfer the special declarant rights to the Meyerses.  The court explained that the deed's plain language excepted the special declarant rights.  It further held that, because the special declarant rights were not transferred, they had terminated.  Additionally, it ruled that equitable estoppel rendered the corrective warranty deed void because the Association had not been notified that the Meyerses' offer included the special declarant rights.

Based on its determination that the Meyerses did not acquire the special declarant rights, the court held that improvements on Lot 13 required pre-approval by the Architectural Control Committee.  The court also held the declaration's plain language required the owner of Lot 13 to provide tiedowns to other lot owners.  Finally, the court held that the declaration restricted use of the airstrip to lot owners.

The Association moved for attorney's fees.  The Meyerses deferred opposition to this motion, explaining that they would seek appellate review of the court's prevailing party determination depending on the outcome of the principal issues on appeal.  The superior court awarded the Association full costs and attorney's fees.

The Meyerses appeal.

## III.   STANDARD OF REVIEW

"We review a grant of summary judgment de novo, 'affirming if the record presents no genuine issue of material fact and if the movant is entitled to judgment as a

8                                                                          7735

matter of law.' "[11] We read the record "in the light most favorable to the non-moving party and [make] all reasonable inferences in its favor."[12]

This case requires review of the superior court's interpretation of a deed. "Whether a deed . . . is ambiguous is a question of law that we review de novo."[13] This case also requires review of the superior court's interpretation of the declaration of a common interest community. We review the interpretation of a declaration de novo, and interpret it in the same manner as a contract.[14]

## IV. DISCUSSION

The Meyerses appeal four aspects of the superior court's ruling, arguing it was error to determine on summary judgment that: (1) the Meyerses did not obtain the special declarant rights, (2) Lot 13 is subject to the Architectural Control Committee's oversight, (3) the Meyerses are required to lease tiedowns on Lot 13 to non-adjacent lot owners, and (4) tenants who are not lot owners cannot use the airstrip and aircraft facilities. They also appeal the court's award of attorney's fees to the Association.

### A. It Was Error To Conclude On Summary Judgment That The Meyerses Did Not Obtain The Special Declarant Rights.

The superior court granted summary judgment to the Association and held that the Meyerses did not obtain the special declarant rights associated with Lot 13. It

---

[11] *Miller v. Fowler*, 424 P.3d 306, 310 (Alaska 2018) (quoting *Kelly v. Mun. of Anchorage*, 270 P.3d 801, 803 (Alaska 2012)).

[12] *Schweitzer v. Salamatof Air Park Subdivision Owners, Inc.*, 278 P.3d 1267, 1271 (Alaska 2012) (quoting *Witt v. State, Dep't of Corr.*, 75 P.3d 1030, 1033 (Alaska 2003)).

[13] *Reeves v. Godspeed Props., LLC*, 426 P.3d 845, 849 (Alaska 2018).

[14] *See Black v. Whitestone Ests. Condo. Homeowners' Ass'n*, 446 P.3d 786, 791 (Alaska 2019).

found the statutory warranty deed was unambiguous and did not transfer the special declarant rights.

We hold it was error to grant summary judgment to the Association because the statutory deed is ambiguous.  Both parties offer reasonable interpretations of the statutory deed's text.  Under these circumstances we remand for the superior court to consider extrinsic evidence of the parties' intent in executing the statutory deed.  However, we agree with the superior court that that the corrective deed is invalid and cannot effectuate a transfer of the special declarant rights because it is barred by equitable estoppel.

### 1. The 2014 statutory warranty deed is ambiguous.

We follow a three-step approach to interpreting a deed.[15]  First, we "look at the four corners of the document to see if it unambiguously presents the parties' intent."[16]  Unlike interpreting a contract, the first step of interpreting a deed "does not allow the use of extrinsic evidence in making the threshold determination whether a deed is ambiguous."[17]  Second, "[i]f a deed is ambiguous, the next step is to consider 'the facts and circumstances surrounding the conveyance' to discern the parties' intent."[18]  The inquiry under this step "can be broad, looking at 'all of the facts and circumstances of the transaction in which the deed was executed, in connection with

---

[15]     *Schweitzer*, 278 P.3d at 1273 (citing *Dias v. State, Dep't of Transp. & Pub. Facilities*, 240 P.3d 272, 274 (Alaska 2010)).

[16]     *Reeves*, 426 P.3d at 849 (quoting *McCarrey v. Kaylor*, 301 P.3d 559, 563 (Alaska 2013)).

[17]     *HP Ltd. P'ship v. Kenai River Airpark, LLC*, 270 P.3d 719, 728 (Alaska 2012) (emphasis omitted) (quoting *Est. of Smith v. Spinelli*, 216 P.3d 524, 530 (Alaska 2009)).

[18]     *Reeves*, 426 P.3d at 849-50 (alteration in original) (quoting *McCarrey*, 301 P.3d at 563).

the conduct of the parties after its execution.' "[19]  Third, "[i]n the event that the parties' intent cannot be determined, we rely on rules of construction."[20]

Both parties argue that the plain language of the statutory warranty deed unambiguously supports their respective positions.  The Meyerses argue that it is reasonable to interpret the deed as conveying two parcels,[21] the first being the real property of Lot 13 — which Rexford Turner transferred as the owner of Turner Custom Homes — and the second parcel being the special declarant rights associated with Lot 13 — which Ingeborg Turner transferred as the declarant.  The Association acknowledges that the statutory deed identified two parcels, but it argues that the deed excepts the second parcel, which is the special declarant rights, from the transfer.

Both constructions are reasonable.  The statutory warranty deed names two parcels and specifies the grantor associated with each parcel.  The deed describes the first parcel as "Lot 13, Block 5 . . . EXCEPTING THEREFROM the Special Declarant [Rights] described as Parcel No. 2 herein."  The deed describes the second parcel as the "Special Declarant Rights set forth in . . . the Declaration of Sky Ranch at Pioneer Peak."

The Association argues that language "excepting" the special declarant rights from the transfer of the first parcel excluded the special declarant rights from the sale altogether, and this interpretation is reasonable.  But this argument does not address the reasonable interpretation proposed by the Meyerses:  that the "EXCEPTING

---

[19]  *Id.* at 850 (quoting *Spinelli*, 216 P.3d at 529).

[20]  *Id.* (alteration in original) (quoting *McCarrey*, 301 P.3d at 563).

[21]  The Association claims that this argument was raised for the first time in the Meyerses' motion for reconsideration, but this is incorrect.  The Meyerses raised this argument in their second sur-reply regarding their opposition to the Association's second motion for partial summary judgment.  The superior court acknowledged receiving the second sur-reply and considered the Meyerses' deed interpretation argument in its ruling, which found that the deed was unambiguous. Thus, the argument was properly before the superior court, and the Meyerses preserved it for appeal.

THEREFROM" language did nothing more than distinguish the first parcel from the second. In other words, even if the first parcel excluded the special declarant rights, the deed separately conveyed the special declarant rights as the second parcel.

This is not a case where "the words of the deed taken as a whole are capable of but one reasonable interpretation."[22] Both the Meyerses' and the Association's interpretations are reasonable, so the deed is ambiguous.[23] We therefore remand to the superior court to consider the facts and circumstances surrounding the conveyance to discern the parties' intent, if possible.

### 2. The 2021 corrective warranty deed did not transfer the special declarant rights.

The Meyerses attempt to use the 2021 corrective warranty deed as extrinsic evidence of the parties' intent in executing the 2014 statutory warranty deed for Lot 13.[24] In the alternative, they argue that even if the statutory deed did not transfer the special declarant rights, the corrective deed accomplished the transfer. The Association responds that equitable estoppel precludes transfer of the special declarant rights via the corrective deed.

The superior court did not consider extrinsic evidence because it found the deed was unambiguous. The court held that the special declarant rights "expired" or "automatically terminat[ed]" after not being conveyed to the Meyerses via the statutory warranty deed. But even assuming the Turners retained the special declarant rights, the

---

[22]    *Spinelli*, 216 P.3d at 530 (quoting *Norken Corp. v. McGahan*, 823 P.2d 622, 626 (Alaska 1991)).

[23]    *See* 26A C.J.S. *Deeds* § 177 (West 2024) ("Ambiguity may be found when the language of the deed is subject to conflicting interpretations, both of which are reasonable.").

[24]    The Meyerses also introduced a title insurance policy as extrinsic evidence in support of their interpretation of the statutory warranty deed. Because we remand to the superior court to proceed to the second step of interpretation, we do not consider evidence of the policy on appeal.

court found using a corrective warranty deed to transfer those rights would prejudice the Association by circumventing its right of first refusal and was thus barred by equitable estoppel.

The statutory warranty deed is ambiguous and we therefore do not address whether the special declarant rights would be extinguished if not transferred. However, we agree with the superior court that equitable estoppel should bar the Meyerses from arguing that the corrective deed conveyed the special declarant rights in 2021. If the special declarant rights were transferred, it must have been accomplished through the statutory deed in 2014.

The Meyerses argue that equitable estoppel should not invalidate the corrective deed. They claim that the Association was not prejudiced because the Association amended the declaration in 2019 to formally extinguish its right of first refusal, so the Association did not have this right when the corrective deed was executed in 2021. The superior court rejected this argument, finding the Association relinquished its right of first refusal under the assumption that the sale of Lot 13 did not include the special declarant rights. The court determined that transferring the special declarant rights by the corrective deed was barred by equitable estoppel because such a result would circumvent the Association's right of first refusal and consequently prejudice the Association. We agree with the superior court.

"[T]he general requirements for application of the doctrine of equitable estoppel are the assertion of a position by conduct or word, reasonable reliance thereon by another party, and resulting prejudice."[25] A right of first refusal includes a right to adequate notice of an offer to purchase the property burdened with the right, including "reasonable disclosure of the material terms" of the offer.[26]

---

[25] *Foster v. Hanni*, 841 P.2d 164, 171 (Alaska 1992).

[26] *Castle Props., Inc. v. Wasilla Lake Church of the Nazarene*, 347 P.3d 990, 994 (Alaska 2015) (quoting *Roeland v. Trucano*, 214 P.3d 343, 348 (Alaska 2009)).

The special declarant rights were a material term of the 2014 transaction between the Meyerses and the Turners for Lot 13. David Meyers stated that he would not have agreed to purchase Lot 13 if the special declarant rights were not part of the purchase, and the Association's then-president stated that the Association likely would not have waived its right of first refusal had it known that the offer included the special declarant rights. The failure of the 2010 sale, which explicitly included transfer of the special declarant rights, and Lot 13's unique characteristics further support the conclusion that the special declarant rights were a material term of the 2014 transaction.

Turner Custom Homes did not provide notice of this material term and the Association reasonably assumed that the 2014 transaction did not include the special declarant rights. The Association waived its right to first refusal and subsequently amended the declaration to eliminate the right based on this reasonable assumption. Allowing the corrective deed to transfer special declarant rights under these circumstances would prejudice the Association. The Meyerses thus are equitably estopped from arguing that the corrective deed transferred the special declarant rights.

**B.    It Was Error To Conclude On Summary Judgement That Lot 13 Is Subject To The Architectural Control Committee's Oversight.**

The superior court ruled that because the Meyerses did not hold the special declarant rights, their construction activity on Lot 13 is subject to the Architectural Control Committee's power of pre-approval under section 9.8(b) of the declaration. On appeal both parties acknowledge that resolution of this issue depends on whether the Meyerses possess the special declarant rights. Because we have held that it was error to conclude on summary judgment that the Meyerses did not obtain the special declarant rights, it was also error to conclude on summary judgment that Lot 13 is subject to the Committee's oversight. The superior court must reconsider this issue on remand.

**C.** **The Superior Court Did Not Err By Ruling That The Meyerses Are Required To Provide Tiedowns On Lot 13.**

The superior court ruled that the plain language of Section 9.7(g) of the declaration requires the owner of Lot 13 to offer tiedowns to owners of lots not adjacent to the runway or taxiway on a first-come, first-served basis. The court refused to consider an expert affidavit that the Meyerses produced, instead ruling that expert opinions are applicable to questions of fact, not law. The court held that the Meyerses cannot avoid their obligation to provide tiedowns by removing several tiedowns and using the remainder for their personal use.

On appeal, the Meyerses argue that the superior court erred in its interpretation of the declaration. They invite us to consider their expert's affidavit in determining whether there is a genuine dispute of material fact about the meaning of relevant portions of the declaration. They also argue that the declaration lacks specificity because it does not prescribe the number of tiedowns Lot 13 must host, guarantee that any tiedowns will be available for lease, or provide an alternative for lot owners in the event Lot 13 has no available tiedowns. They compare the requirements of section 9.7(g) to an unenforceable, gratuitous offer because the provision merely requires Lot 13's owner to "offer" a tiedown space if one is available. The Meyerses conclude that "offering" a tiedown space is necessarily less affirmative than an obligation to "provide" one.

The Association counters that the declaration provides non-adjacent lot owners priority for use of the tiedowns on Lot 13. It notes that the Meyerses can make tiedowns available by storing their own aircraft on their residential lot, which abuts the airstrip. It also claims that the Meyerses frustrated the purpose of section 9.7(g) by removing all but three tiedowns, and that the Meyerses could simply add back tiedowns to make more available.

Based on a plain reading of the declaration, the Meyerses must offer tiedowns to owners of lots not adjacent to the runway or taxiway on a first-come, first-

served basis because they own Lot 13. Article IX, section 9.7(g) of the declaration provides in part:

> Owners of Lots which are adjacent to the runway or a taxiway . . . may park a maximum of two aircraft on their Lot via tie down. No aircraft will be allowed to park on or adjacent to runways except those belonging to the Lot Owners described above. Owners of Lots not adjacent to the runway or a taxiway will be offered, on a first come, first served basis, an assigned tiedown on Lot Thirteen (13) . . . . Those owners may transfer their interest in the tiedown only if the interest in their primary Lot is also transferred.

Article VI, section 6.3 of the declaration, as amended in 2019, provides that:

> Operation and maintenance of Lot Thirteen (13), Block Five (5) is privately held and shall be the sole responsibility of the propertys [sic] owner. The owner of that property may charge airport apron user fees at the rate commonly used on an area of 1200 square feet for each assigned tie down. The owner of the aircraft will be responsible for the maintenance of his or her specific tie down facility.

The Meyerses' expert affidavit is of minimal persuasive value. Expert opinion testimony is meant to "assist the trier of fact to understand the evidence or to determine a fact in issue."[27] But in this case, the expert opinion essentially drew conclusions of law. The expert opined that section 9.7(g) created "no defined property interest" and "constitute[d] an unreasonable restraint on alienation." The superior court disagreed. It found that the declaration adequately described the property interest because it applied to non-adjacent lot owners on a first-come, first-served basis. The court also found that the declaration described the essential terms of the tiedown agreement because it provided that a rental fee would be set at the commonly used rate

---

[27] Alaska R. Evid. 702(a).

for similar tiedowns. The court's decision to discount the expert's affidavit was reasonable because the expert was offering legal conclusions, not factual assertions.

The Meyerses' argument that section 9.7(g) lacks specificity does not convince us that it is merely an unenforceable offer. The plain language of the declaration provides that non-adjacent lot owners "will be offered" tiedowns on Lot 13.[28] And it allows Lot 13's owner to collect fees from those who use the tiedowns. The language of section 9.7(g) does not require the Meyerses to guarantee an unlimited number of tiedowns. However, "[u]nder Alaska's contract law, 'the covenant of good faith and fair dealing . . . is implied in all contracts.' "[29] Therefore, the declaration requires the Meyerses to offer, in good faith, unused tiedowns for lease to interested non-adjacent lot owners. Although the ownership of Lot 13 comes with the burden of offering tiedowns, that burden comes with the benefit of collecting fees for those services. The requirement in section 9.7(g) is not an unreasonable restraint on alienation[30] or a violation of public policy.[31]

---

[28]     *See Matanuska Elec. Ass'n, Inc. v. Chugach Elec. Ass'n, Inc.*, 99 P.3d 553, 562 (Alaska 2004) (explaining parties' intent is determined in part by "examining the language of the disputed provisions").

[29]     *Lockwood v. Geico Gen. Ins. Co.*, 323 P.3d 691, 697 (Alaska 2014) (quoting *State Farm Mut. Auto. Ins. Co. v. Weiford*, 831 P.2d 1264, 1266 (Alaska 1992)).

[30]     *Shaffer v. Bellows*, 260 P.3d 1064, 1071–72 (Alaska 2011) (explaining that restraint on alienation is "invalid if the restraint is unreasonable[,] [which] is determined by weighing the utility of the restraint against the injurious consequences of enforcing the restraint" (quoting RESTATEMENT (THIRD) OF PROPERTY: SERVITUDES § 3.4 (AM. L. INST. 2000))).

[31]     *Wayson v. Stevenson*, 514 P.3d 1263, 1274 (Alaska 2022) (listing examples of servitudes violating public policy, including "if they (1) '[are] arbitrary, spiteful, or capricious;' (2) 'unreasonably burden[] a fundamental constitutional right;' (3) 'impose[] an unreasonable restraint on alienation;' (4) 'impose[] an unreasonable restraint on trade or competition;' or (5) '[are] unconscionable.' " (alterations in

The Meyerses are correct that the declaration does not provide non-adjacent lot owners a priority to all available tiedowns on Lot 13. Nothing in the language of 9.7(g) indicates non-adjacent lot owners would have such a priority. But the Meyerses are obligated to make good faith offers to non-adjacent lot owners who are interested in renting tiedowns.[32]

### D. It Was Error To Conclude On Summary Judgment That Only Lot Owners Are Permitted To Use The Airstrip Or Aircraft Facilities.

The superior court ruled on summary judgment that the exclusive use provisions of the declaration limit use of the airstrip and aircraft facilities to lot owners. This ruling was error because the declaration is ambiguous on this point. Further, there is extrinsic evidence that, viewed in the light most favorable to the Meyerses, suggests the declaration allows non-lot owners to use the airstrip and aircraft facilities in some circumstances. However, we agree with the superior court that the Association has not abandoned the declaration's limits on such use. We remand for a determination regarding the extent to which non-lot owners are permitted to use the airstrip and aircraft facilities.

---

original) (quoting RESTATEMENT (THIRD) OF PROPERTY: SERVITUDES § 3.1 (AM. L. INST. 2000))).

[32] At oral argument, the Association declined to take a position on the number of tiedowns that the Meyerses must make available because this issue was "outside the scope of what the trial court was asked to determine." Consequently, we decline to prescribe the number of tiedowns that the Meyerses must offer under the declaration. *Harvey v. Cook*, 172 P.3d 794, 802 (Alaska 2007) (explaining "issues not properly raised in the trial court will not ordinarily be considered on appeal" because deciding such issues "is both unfair to the trial court and unjust to the opposing litigant" (quoting *In re Marriage of Walker*, 42 Cal. Rptr. 3d 325, 332 (Cal. App. 2006))).

### 1. The declaration is ambiguous as to whether non-lot owners are permitted to use the airstrip or aircraft facilities.

We interpret a declaration in the same manner as a contract.[33] Interpretation of a contract is ordinarily a question of law.[34] "But interpretation 'becomes a task for the trier of fact when the parties present extrinsic evidence to clarify a contract's meaning, when this evidence points towards conflicting interpretations of the contract, and when the contract itself is reasonably susceptible of either meaning.' "[35]

Here, the superior court's analysis began by appropriately focusing on the relationship between two provisions in the declaration. First, Article IX, section 9.7(f), entitled "Guest Use of Airstrip," provides, "No aircraft not owned by a Lot Owner shall be allowed to land on the airstrip or to use any of the aircraft facilities located within the Community." But "guests may utilize the runway at the invitation of Lot owners," so long as they follow rules established for the runway and park their aircraft at the owner's lot or tiedown for no longer than 72 hours.

Second, the 2019 amendment to the declaration, which defined the term "Renter," provides:

> A renter is an individual who is currently in an active contract with an Association Member for living quarters and/or aircraft parking space(s), in a hanger or outdoors via tie down. Other than as described herein for Lot 13 Block 5, homeowners may not separately rent tie downs or hangers on their lot to non-HOA members.

---

[33] *See Black v. Whitestone Ests. Condo. Homeowners' Ass'n*, 446 P.3d 786, 791 (Alaska 2019).

[34] *Norville v. Carr-Gottstein Foods Co.*, 84 P.3d 996, 1004 (Alaska 2004).

[35] *Id.* (quoting *Little Susitna Constr. Co. v. Soil Processing, Inc.*, 944 P.2d 20, 23 (Alaska 1997)).

The superior court concluded that Section 9.7(f) was unambiguous and the 2019 Amendment did not "change or rescind" Section 9.7(f), which it found "explicitly precludes" non-lot owner use. We disagree. The declaration is ambiguous and extrinsic evidence suggests that non-lot owners are allowed some use of the airstrip and aircraft facilities in some circumstances.

While the declaration is reasonably susceptible to the superior court's interpretation, it is also reasonably susceptible to a conflicting interpretation. The first sentence of the 2019 amendment could be reasonably interpreted to mean that non-lot owners are permitted to rent living quarters, hangar space, and tiedowns in Sky Ranch. Under this interpretation of the 2019 amendment, non-lot owners who are renting living quarters must be allowed to use the airstrip because otherwise the declaration would prevent them from flying into or out of Sky Ranch.

In line with this interpretation, the definition of "renter" must, at a minimum, allow non-lot owners who are renting living quarters to use the common airstrip and aircraft facilities. And the second sentence of the 2019 amendment could reasonably be understood to clarify that lot owners, with the possible exception of the owner of Lot 13, may only rent hangar space or tiedowns to non-lot owners who are contracting with a community member for living quarters; while the owner of Lot 13 is permitted to rent to non-lot owners regardless of whether they are contracting with a community member for living quarters.

Additionally, the superior court acknowledged that the Meyerses offered extrinsic evidence that non-lot owners used the airstrip and aircraft facilities an undetermined number of times over several years. The court only considered this evidence as it related to the abandonment argument addressed immediately below; it did not consider it when interpreting the meaning of the declaration. However, the Meyerses' extrinsic evidence creates a genuine dispute of material fact regarding the extent to which non-lot owners may use the airstrip. In one instance, the Association determined that no enforcement action was warranted against a lot owner who allowed

a non-lot owner who was renting his residence to use the airstrip in a plane that he and the non-lot owner jointly owned. When viewed in the light most favorable to the Meyerses, this extrinsic evidence shows non-lot owner use that exceeded that permitted to a guest under section 9.7(f) and tends to support an interpretation of the declaration that allows non-lot owners to use the airstrip and aircraft facilities — at least if they are renting living quarters from a community member.

> **2.** **The Association did not abandon restrictions on non-lot owner use.**

The Meyerses argue that permitting two instances of non-owner use constitutes abandonment of the exclusive use provisions, so the Association cannot enforce them. Because the non-owners' use continued for several years, the Meyerses argue the Association allowed "habitual[] and substantial[]" violations. The Association responds that permitting two violations is insufficient to constitute "substantial and general noncompliance" required to find the Association abandoned the exclusive use provisions.

Though the parties refer to both "waiver" and "abandonment," they map their arguments onto the test for abandonment, albeit in different formulations.[36] The Meyerses argue that the applicable standard for abandonment comes from *B.B.P. Corp. v. Carroll*.[37] In *B.B.P. Corp.* we held that "[i]f a covenant which applies to an entire tract has been habitually and substantially violated so as to create an impression that it has been abandoned, equity will not enforce the covenant."[38] The Association urges us

---

[36] Abandonment terminates a covenant that has not been enforced. *B.B.P. Corp. v. Carroll*, 760 P.2d 519, 523 (Alaska 1988). In contrast, waiver relinquishes an otherwise-existing right in a particular instance. *See Powers v. United Servs. Auto. Ass'n*, 6 P.3d 294, 299 (Alaska 2000) (holding appellees did not waive right to arbitrate appellant's claim for damages).

[37] 760 P.2d 519.

[38] *Id.* at 523-24 (quoting *White v. Wilhelm*, 665 P.2d 407, 411 (Wash. App. 1983)).

to follow a more recent case, *Kalenka v. Taylor*.[39]  In *Kalenka*, we explained that covenants may be abandoned through "substantial and general noncompliance."[40]

Both standards lead to the same outcome.  In *Collins v. Hall*, a property owner sought to enforce a subdivision's restrictive covenants.[41]  Noting widespread violations of the covenants and the lack of any homeowners' association to enforce the covenants, we concluded the covenants had been abandoned.[42]  But while we determined the covenant had been abandoned under those facts, we cautioned that "[f]ailure to enforce a covenant against a single party or property is not sufficient to establish abandonment."[43]

Under the circumstances of this case, two possible violations of the exclusive use provision do not constitute the "widespread lack of enforcement" or "substantial and general noncompliance" necessary to show a covenant has been abandoned.[44]  Although the Meyerses allege the two violations were long-term, they appear more like isolated cases of favoritism:  One alleged violator was a romantic partner of the President of the Association's Board of Directors and the other was a former lot owner.  It is not clear that the latter instance violated the declaration; the Association ultimately determined that the non-lot owner could land on the airstrip in a plane titled to a current lot owner.  And unlike in *Collins*, where the community never created an association to enforce its covenants,[45] the Association here took action.  It

---

[39]   896 P.2d 222 (Alaska 1995).

[40]   *See id.* at 226 (quoting *B.B.P. Corp.*, 760 P.2d at 523-24).

[41]   453 P.3d 178, 180 (Alaska 2019).

[42]   *Id.* at 192.

[43]   *Id.*

[44]   *See id.*; *Kalenka*, 896 P.2d at 226.

[45]   *See* 453 P.3d at 192.

sent notices of suspected violations to the lot owners soon after the Meyerses brought up the issue. The Meyerses' abandonment argument thus fails.

### E. Attorney's Fees Must Be Decided On Remand.

The superior court awarded the Association full attorney's fees and costs pursuant to the declaration.[46] We have upheld awards of actual, reasonable attorney's fees in cases where a common interest community's declaration provides for such awards.[47]

The Meyerses argue that if we grant their requested relief, we should determine they are the prevailing party and remand the issue for calculation of an award. The Association counters that we should simply remand for further proceedings if we reverse the superior court's substantive rulings.

We agree with the Association. The prevailing party determination is within the broad discretion of the superior court.[48] Because we reverse portions of the superior court's ruling on summary judgment, we also vacate the award of attorney's fees and remand for reconsideration of the prevailing party determination.[49]

---

[46] The declaration entitles the prevailing party in an action between any lot owner and the Association to attorney's fees and costs.

[47] *See Stadnicky v. Southpark Terrace Homeowner's Ass'n*, 939 P.2d 403, 406 (Alaska 1997); *Black v. Whitestone Ests. Condo. Homeowners' Ass'n*, 446 P.3d 786, 796 (Alaska 2019).

[48] *Lee v. Konrad*, 337 P.3d 510, 525 (Alaska 2014).

[49] *See Guerrero v. Guerrero*, 362 P.3d 432, 446 (Alaska 2015) (vacating attorney's fees award so "[t]he superior court may make a new prevailing party determination and attorney's fees calculation at the conclusion of the proceedings on remand"); *see also Curtiss v. Hubbard*, 703 P.2d 1154, 1154 (Alaska 1985) ("An appellate decision affirming a judgment in part and reversing it in part may change important facts on which an earlier prevailing party determination was based. The trial court has the power to reconsider its determination after such a decision so that the goal of awarding partial attorney's fees to the party who has won the lawsuit can be realized.").

## V. CONCLUSION

We REVERSE the superior court's order granting summary judgment and REMAND for further proceedings to determine whether the Meyerses possess the special declarant rights and the extent to which non-lot owners are permitted to use the airstrip and aircraft facilities. The court's determination regarding possession of the special declarant rights will inform whether Lot 13 is subject to the Architectural Control Committee's oversight. We AFFIRM the court's determination that Lot 13's owners must offer tiedowns on Lot 13 to non-adjacent lot owners. We VACATE the superior court's award of attorney's fees to the Association pending resolution of the matters on remand and a new prevailing party determination.